J-S81031-18

2019 PA Super 47

| | | |
|---|---|---|
| DONNA LUDWIG | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH G. MCDONALD; ROBERT J. | : | No. 1277 MDA 2018 |
| BURSHNICK; AND LTC ASSOCIATES, | : | |
| LLC T/A FOREST CITY NURSING AND | : | |
| REHAB CENTER AND/OR FOREST | : | |
| CITY NURSING CENTER | : | |

Appeal from the Judgment Entered July 9, 2018
In the Court of Common Pleas of Susquehanna County Civil Division at
No(s):  2010-Civil-0623

BEFORE:   STABILE, J., DUBOW, J., and STEVENS*, P.J.E.

OPINION BY STEVENS, P.J.E.:                    **FILED FEBRUARY 21, 2019**

Appellant, Donna Ludwig, files this appeal from the order granting

summary judgment in favor of Appellee LTC Associates, LLC T/A Forest City

Nursing and Rehab Center and/or Forest City Nursing Center ("LTC

Associates"), as made final by the entry of judgment in favor of Appellant and

against Joseph G. McDonald ("Mr. McDonald").[1]  After a careful review, we

affirm.

---

[1] We note that "[t]he lower court's decision to grant partial summary judgment
is independently appealable upon entry of final judgment." ***Vetter v. Miller***,
157 A.3d 943, 948 (Pa.Super. 2017) (citation omitted)).  As discussed below,
all claims have been disposed of as to all parties such that the appeal is
properly before us.

---

\* Former Justice specially assigned to the Superior Court.

The relevant facts and procedural history are as follows: Appellant filed a civil complaint averring that, on July 1, 2008, at approximately 5:30 p.m., Appellant parked her vehicle alongside the northbound lane (with the direction of traffic) of Hudson Street in Forest City, Pennsylvania. Appellant averred that, after she exited the vehicle, Mr. McDonald, who was operating a Chevrolet Equinox in the southbound lane, entered the northbound lane and struck Appellant as she was standing by her vehicle. Appellant alleged that Mr. McDonald entered the northbound lane, in part, to avoid the vehicle of Robert J. Burshnick ("Mr. Burshnick"), who had parked his Chevrolet pick-up truck in the southbound lane (against the direction of traffic). Appellant, who suffered serious injury, alleged that, at the time of the incident, Mr. McDonald was driving his Chevrolet Equinox "within the course and scope of his authority" as an employee for LTC Associates, who was in the business of operating a nursing home in Forest City ("the nursing home").

In the complaint, Appellant presented claims of negligence as to Mr. McDonald and Mr. Burshnick. She also presented a claim of vicarious liability as to LTC Associates averring that, at all material times, Mr. McDonald operated his vehicle within the scope of his employment and with the consent of LTC Associates.

On August 12, 2010, LTC Associates filed an answer with new matter. LTC Associates admitted that Mr. McDonald was an employee of LTC Associates; however, LTC Associates denied that, at the time of the incident,

Mr. McDonald was driving his Chevrolet Equinox within the scope of his employment, in furtherance of LTC Associates' business, or with LTC Associates' knowledge and consent. LTC Associates specifically responded that, at the time of the incident, Mr. McDonald was on vacation, and LTC Associates attached to its answer a copy of Mr. McDonald's "Time Off Request Form."

Thereafter, discovery commenced and Mr. McDonald's recorded statement, which he made to his automobile insurance company the day after the incident, was entered into the record as an exhibit. In the statement, Mr. McDonald relevantly indicated that he was repairing his front porch and was "on vacation" from work on the day of the accident. *See* Statement of Mr. McDonald, dated 7/2/08, at 2-3. The following relevant exchange occurred between Mr. McDonald and the insurance adjuster:

> **[Q]:** And where were you going to and coming from when [the accident] happened?
>
> **[A]:** I ran…I…See I went to work earlier in the afternoon.
>
> **[Q]:** Okay.
>
> **[A]:** I'm on vacation but I went up to put some lumber up at work[.]
>
> **[Q]:** Okay.
>
> **[A]:** And they needed my car ramps. So I said, okay no problem. I took them off, they borrowed them. I…they left my tape measure there. So, I had to go over [to] my sister in law's in Forest City.
>
> **[Q]:** Okay.
>
> **[A]:** I said well I'm…I'm here I'll go up and get my tape measure.
>
> **[Q]:** Yeah.

[A]: I ran over, got my tape measure. I'm coming back across, the sun's out. This lady…she just stepped out behind the car. I didn't see her.

*Id.* at 3.

Mr. McDonald's deposition was also entered into the record. Mr. McDonald confirmed in his deposition that, on the date of the accident, he was employed full-time by LTC Associates and worked for the maintenance department at the nursing home where his duties included general repair, grass cutting, general construction, and other general maintenance. Mr. McDonald's Deposition, dated 12/2/10, at 17. Mr. McDonald indicated that LTC Associates owned two pick-up trucks, which he sometimes used to perform his job duties, including snowplowing and picking up supplies at area stores. *Id.* at 21-22. He testified he did not have to ask the maintenance supervisor, Andy Conklin, to use the pick-up trucks during work hours. *Id.* at 22. He indicated he never used his personal vehicle to pick up supplies for his employer, and he never picked up supplies during his non-working hours. *Id.* Mr. McDonald testified he brought his personal tools to use at work as it made his job easier. *Id.* at 24. He acknowledged that, on occasion, when he was working, he would need a specific tool and would drive to his house to retrieve one. *Id.* at 25. His house was located approximately five or ten minutes from the nursing home. *Id.*

Mr. McDonald confirmed that his employer used a written "Time Off Request Form," and on June 1, 2008, he completed a written form requesting

time off from June 27, 2008, to July 10, 2008.[2] Further, he indicated that he filled out his own time card, and the time card confirmed that he took vacation time on July 1, 2008.[3] Mr. McDonald testified that, on the day of the accident, he was on vacation from work and fixing his porch when he realized that he needed some tools, which he had left at the nursing home. *Id.* at 33-34. He testified that, at approximately 5:00 p.m., he drove his personal vehicle to the nursing home, stayed five minutes, and retrieved the necessary tools from the maintenance building, which he opened with his keys. *Id.* at 41, 49. He denied that he did "any type of work" or saw any of his co-workers during this five-minute period. *Id.*

Mr. McDonald testified that, as he drove back home, the "sun was unbelievable" and there was a pick-up truck parked on his side of the road. *Id.* at 48. As he swerved around the pick-up truck, he hit Appellant. *Id.*

Mr. McDonald confirmed that, the day after the accident, he gave a recorded statement to his automobile insurance company. *Id.* at 49. With regard to the recorded statement, Mr. McDonald clarified as follows upon questioning at his deposition:

---

[2] During Mr. McDonald's deposition, the "Time Off Request Form," bearing Mr. McDonald's signature, was shown to him and marked for identification purposes. *Id.* at 34.

[3] During Mr. McDonald's deposition, the time card was shown to Mr. McDonald and marked for identification purposes. *Id.* at 37-38.

**Q:** Okay, [] you indicated [in the statement], "I ran—see, I went to work earlier in the afternoon." When you went to work earlier in the afternoon, was that just to retrieve your items?

**A:** Yes.

**Q:** But if you go down a little bit more, the next line down [in the statement], it says, "I'm on vacation, but I went to put some lumber up at work."

**A:** See, that's one I don't remember. I don't remember that, unless I took some scrap lumber up just to throw up there, you know.

**Q:** Was there any project going on, construction-wise, up at the nursing home on July 1st that you would've recalled?

**A:** No.

**Q:** Is there anything that you recollect as far as why you would've made a statement that you were putting some lumber up at work on that day?

**A:** The only thing I could think of is, like, I was taking some old lumber that I tore off the porch up there, to just get rid of.

**Q:** Okay, and would that have been-how is it disposed of up there at work, versus your house?

**A:** Well, Andy Conklin would just take it and burn it in his wood burner.

**Q:** Would there be any use for recycled wood up at the nursing home?

**A:** No, No.

***

**Q:** Okay, and you recollect that if you brought scrap lumber up, it would've been for Andy Conklin to burn at home?

**A:** Yes, in his wood burner. Anything I had, he asked me—any scrap I give him, he would take it.

***

**Q:** The next statement down, it says, "And they needed my car ramps, so I said, Okay, no problem. I took them off. They borrowed them. I-they locked my tape measure there, so I had to go over my sister-in-law's in Forest City." Can you explain in detail, what you were talking about there?

**A:** Yeah. I had to go pick up something for my wife there, in Forest City, at my sister-in-law's, so that's when I said I would go get my car ramps, and I'll get my table saw, and I'll get my hand tools.

**Q:** Okay. Reading that, at first glance, I thought the nursing home needed your car ramps, and you were dropping them off or something?

**A:** No. They were sitting there—

**Q:** That's not the case?

**A:** No, [], I had to fix the muffler on the truck.

**Q:** Okay. So when you were telling this representative from your carrier, when you were telling him your story, it sounds like you were speaking of prior to this date, the nursing home needed your car ramps?

**A:** Yeah. They were there before, yeah.

**Q:** Okay. All right, and then when you said, "So I said, Okay, no problem," are you saying that prior to this date when they needed the car ramps, you said, "No problem," and you lent them to the nursing home?

**A:** Right.

*Id.* at 49-54.

Upon further examination at his deposition, Mr. McDonald clarified that he drove to the nursing home twice on July 1, 2008. Specifically, he went to the nursing home at approximately 12:30 p.m. to take an inventory of which personal tools he had left at the nursing home. *Id.* at 86-88. He testified that he did not talk to any of his co-workers; but rather, he looked in the maintenance shed, determined which tools he had left there, and then went back to his house to start the porch project. *Id.* at 88-89. He returned to the nursing home at approximately 5:00 p.m. to retrieve the tools that he needed

for the project, and the accident occurred thereafter on his way home. *Id.* at 89.

With regard to the car ramps, Mr. McDonald clarified that he took the car ramps to the nursing home "a couple of days before" the accident and not during his vacation time. *Id.* at 97-98. He indicated he took the car ramps to the nursing home because it made it easier to work on the nursing home's pick-up trucks and he left the car ramps in the nursing home's garage. *Id.* at 98. He denied anyone from LTC Associates specifically asked him to bring the car ramps to work, but he admitted his employer was aware that he was using his personal tools at work, including the car ramps. *Id.* at 99.

Andy Conklin ("Mr. Conklin") confirmed in his deposition that he was Mr. McDonald's supervisor in the maintenance department. *See* Mr. Conklin's Deposition, dated 3/29/11, at 13. He further confirmed that the nursing home had pick-up trucks for the employees to use during work hours, and thus, employees did not use their own personal vehicles to run errands for work purposes. *Id.* at 13-14. He noted that employees could not use the employer's vehicles for personal use and did not take them home. *Id.* at 15.

Mr. Conklin testified that, on July 1, 2008, Mr. McDonald was "on vacation." *Id.* at 17. He denied seeing Mr. McDonald at the nursing home on July 1, 2008. *Id.* However, he confirmed that, as a matter of convenience, Mr. McDonald used his personal tools at the nursing home, and he had the ability to retrieve the tools from the nursing home's garage during his vacation

time. *Id.* at 22, 25, 33. With regard to the car ramps, he indicated Mr. McDonald would bring them to the nursing home "once in a blue moon," but he had no recollection of whether the car ramps were at the nursing home on the day in question. *Id.* at 31-32.

When presented with Mr. McDonald's "Time Off Request Form," Mr. Conklin confirmed it was the normal form used by the nursing home and he had signed the form approving Mr. McDonald's request. *Id.* at 29. He further confirmed that Mr. McDonald's time card reflected that he used vacation time on July 1, 2008. *Id.* at 30. He noted that employees would not come to the nursing home to sign their names on their time cards during their vacations; but rather, Mr. Conklin would complete the time cards for them. *Id.* at 30-31.

At the conclusion of discovery, on August 3, 2011, Mr. Burshnick filed a motion for summary judgment. Therein, Mr. Burshnick relevantly averred that the direction in which he parked his pick-up truck did not cause or contribute in any manner to the accident such that he was not liable for Appellant's injuries. Appellant filed no response to Mr. Burshnick's motion for summary judgment, and accordingly, by order entered on September 20, 2011, the trial court granted the summary judgment motion, dismissing Mr. Burshnick from the action with prejudice.

On September 9, 2011, LTC Associates filed a motion for summary judgment. Therein, LTC Associates averred that Mr. McDonald personally owned the Chevrolet Equinox, and on the date of the incident, Mr. McDonald

was "on vacation." LTC Associates argued there was no evidence that Mr. McDonald was acting within the scope of his employment, acting in furtherance of LTC Associates' business, or driving his personal vehicle with LTC Associates' consent or knowledge at the time of the incident. Accordingly, LTC Associates contended that, to the extent Mr. McDonald was negligent, LTC Associates was not vicariously liable for his acts.

Appellant filed an answer and brief in opposition to LTC Associates' motion for summary judgment. By opinion and order entered on January 16, 2012, the trial court granted LTC Associates' motion for summary judgment, concluding:

> We have found that there is no genuine issue of material fact remaining regarding whether [Mr.] McDonald was working in the scope of his employment with [LTC Associates] when he was involved in the motor vehicle accident with [Appellant]. We find that [Mr.] McDonald was not acting in the scope of his employment and therefore, we find that [LTC Associates] is entitled to judgment as a matter of law. [LTC Associates] cannot be held liable for the negligence of [Mr.] McDonald.

Trial Court Opinion, filed 1/16/12, at 15. Accordingly, the trial court granted LTC Associates' motion for summary judgment and dismissed LTC Associates from the action with prejudice.[4]

_____

[4] Appellant filed a notice of appeal from the trial court's January 16, 2012, opinion and order; however, since claims remained pending against Mr. McDonald, by *per curiam* order entered on May 11, 2012, we quashed the appeal. On February 1, 2013, Appellant filed a petition seeking permission to appeal the interlocutory order, and the trial court granted the petition, indicating its January 16, 2012, order involved a controlling question of law

On November 16, 2015, Mr. McDonald filed an answer with new matter to Appellant's complaint. Thereafter, the parties reached a stipulation for the entry of judgment in favor of Appellant and against Mr. McDonald in the amount of $350,000.00.[5] Accordingly, on July 9, 2018, Appellant filed a praecipe for the entry of judgment in her favor, and on July 30, 2018, she filed a timely notice of appeal. The trial court did not order Appellant to file a Pa.R.A.P. 1925(b) statement, and consequently, Appellant did not file such a statement. On August 15, 2018, the trial court filed a "Statement as to Matters Complained of on Appeal," indicating the reasons for its decision appear in its opinion and order filed on January 16, 2012.

On appeal, Appellant presents the following issue:

Whether the trial court committed error by granting summary judgment in favor of [LTC Associates] where a genuine issue of material fact existed as to whether the co-defendant, [Mr.] McDonald, was acting in the course of his employment at the time the accident occurred?

Appellant's Brief at 5.[6]

_____

and an immediate appeal may materially advance the ultimate termination of the matter. Appellant filed another notice of appeal; however, Appellant then filed a praecipe for discontinuance of the notice of appeal.

[5] In the stipulation, the parties acknowledged that Appellant intended to file an appeal to this Court challenging the trial court's January 12, 2012, summary judgment order. The parties agreed that, if this Court reverses the order, the judgment against Mr. McDonald will be non-binding.

[6] We note that it was unnecessary for Appellant to file post-trial motions in order to preserve her claims related to the entry of summary judgment in favor of LTC Associates. *See Vetter*, *supra*; Pa.R.Civ.P. 227.1, Note.

- 11 -

It is well-settled that:

> Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.
>
> Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment.

*Hovis v. Sunoco, Inc.*, 64 A.3d 1078, 1081 (Pa.Super. 2013) (quoting

*Cassel–Hess v. Hoffer*, 44 A.3d 80, 84–85 (Pa.Super. 2012)).

Our Supreme Court has opined on the differences between direct and

vicarious liability.

> To prove negligence, a plaintiff may proceed against a defendant on theories of direct and vicarious liability, asserted either concomitantly or alternatively. Liability for negligent injury is direct when the plaintiff seeks to hold the defendant responsible for harm the defendant caused by the breach of duty owing directly to the plaintiff. By comparison, vicarious liability is a policy-based allocation of risk. Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that [it] possibly can to prevent it. Once the requisite relationship (i.e., employment, agency) is demonstrated, the innocent victim has recourse against the principal, even if the ultimately responsible agent is unavailable or lacks the availability to pay.

***Scampone v. Highland Park Care Center, LLC***, 618 Pa. 363, 57 A.3d 582, 597 (2012) (citations and internal quotation marks omitted).

Under Pennsylvania law, in order to hold an employer vicariously liable for the negligent acts of its employee, these acts must be "committed during the course of and within the scope of the employment." ***Sutherland v. Monongahela Valley Hosp.***, 856 A.2d 55, 62 (Pa.Super. 2004) (citation omitted). ***See Spitsin v. WGM Transp. Inc.***, 97 A.3d 774 (Pa.Super. 2014) (recognizing an employer may be held liable for an employee's actions that are committed during the scope of employment).

> [Generally,] [t]he conduct of an employee is considered within the scope of employment for purposes of vicarious liability if: (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer.

***Sokolsky v. Eidelman***, 93 A.3d 858, 863–64 (Pa.Super. 2014) (quotation omitted).

However, the issue in this case must be defined more narrowly. With regard to situations involving automobile accidents, Pennsylvania courts have looked to the standard set forth in Restatement (Second) of Agency § 239 in determining whether the employer is vicariously liable for the negligent driving of the employee. ***See Cesare v. Cole***, 418 Pa. 173, 210 A.2d 491 (1965); ***Ferrell v. Martin***, 419 A.2d 152 (Pa.Super. 1980). As this Court has recognized:

> To hold [an employer] legally responsible for the act of [an employee] who is engaged in furthering his [employer's] business and who while doing so negligently uses some instrumentality that carries him from place to place, it must either be proved that the [employer] exercises actual or potential control over that instrumentality, or the use of the instrumentality at the time and place of the act complained of must be of such vital importance in furthering the business of the [employer] that the latter's actual and potential control of it at that time and place may reasonably be inferred.

*Ferrell*, 419 A.2d at 154 (quotations and quotation marks omitted). *See*

Restatement (Second) of Agency § 239 (1958).

> Further,

> The fact that the instrumentality used by the [employee] is not owned by the [employer] is a fact which may indicate that the use of the instrumentality is not authorized, or if authorized, that its use is not within the scope of employment….The fact that he does not own it or has not rented it upon such terms that he can direct the manner in which it may be used indicates that the [employee] is to have a free hand in its use. If so, its control by the [employee], although upon his [employer's] business, is not within the scope of the employment.

*Ferrell*, 419 A.2d at 154-55 (quotation marks, quotations, and citations

omitted).

"Generally, the scope of [an employee's] employment is a fact question

for the jury. Where the facts are not in dispute, however, the question of

whether….the [employee] is within the scope of his [] employment is for the

court." *Id.* at 155 (citations omitted). *See Spitsin*, *supra*.

Here, there is no dispute that there was an employee-employer

relationship between Mr. McDonald and LTC Associates inasmuch as Mr.

McDonald worked at the nursing home. However, contrary to Appellant's

claim, there is no genuine issue of material fact establishing that Mr. McDonald was acting within the scope of his employment or in furtherance of LTC Associates' business at the time of the accident. Rather, the undisputed evidence reveals that Mr. McDonald was not working on July 1, 2008, was using his "vacation time," and was repairing a porch at his home. The fact Appellant went to his place of employment, retrieved personal tools for a home project, and was driving home when the accident occurred, does not place his actions "within the scope of employment." As the trial court notes, "[Mr. McDonald] freely chose to travel to his place of employment in his personal vehicle to pick up a tool which he planned to use on his personal project."[7] Trial Court Opinion, filed 1/16/12, at 13.

In any event, assuming, *arguendo*, Mr. McDonald was engaged in furthering LTC Associates' business at the time he was driving his personal vehicle, there is no evidence that LTC Associates exercised actual or potential

_____

[7] In averring there is a genuine issue of material fact as to whether Mr. McDonald was acting within the scope of his employment, Appellant argues Mr. McDonald told the insurance adjuster that he was directed by his employer to bring his car ramps to the nursing home and, on the way home, the accident occurred. *See* Appellant's Brief at 20. In support thereof, Appellant points to the following portion of Mr. McDonald's recorded statement: "And they needed my car ramps. So I said, okay no problem. I took them off, they borrowed them." Statement of Mr. McDonald, dated 7/2/08, at 3. However, when read in context, at most, the insurance statement reasonably suggests that, earlier in the afternoon, during his first trip to his place of employment, Mr. McDonald took the car ramps to his employer, or, as he testified to in his deposition, he brought the car ramps to the nursing home sometime prior to the day of the accident.

control over Mr. McDonald's vehicle or the use of such vehicle at the time and place of the accident was of such vital importance in furthering LTC Associates' business that we may infer LTC Associates' actual or potential control. *See Ferrell*, *supra*. For example, there is no evidence that LTC Associates directed Mr. McDonald to use his personal vehicle at the time in question. *Cesare*, 418 Pa. 173, 210 A.2d at 494 ("[The employee] was not directed to use his automobile by [the employer] so that no actual or potential control is present."). Further, when we consider the nature of Mr. McDonald's employment, the vital importance or even the reasonable necessity of the use of his own automobile to LTC Associates "disappears." *See id.* Mr. McDonald worked in the maintenance department, and there is no dispute that LTC Associates provided pick-up trucks to be used by employees during work hours. There is no evidence that the use of Mr. McDonald's private vehicle was either "vitally important or reasonably necessary to the employer's business," particularly at the time and place of the accident. *See Ferrell*, *supra*. Accordingly, for all of the foregoing reasons, we conclude liability could not attach to LTC Associates with respect to Mr. McDonald's negligent driving, and therefore, we affirm the trial court's entry of summary judgment in favor of LTC Associates.[8]

---

[8] Finally, we note that Appellant suggests the trial court entered summary judgment in favor of LTC Associates in violation of the *Nanty-Glo* rule. *See* Appellant's Brief at 16-17 (citing *Borough of Nanty-Glo v. American*

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/21/2019

---

***Surety Co. of New York***, 309 Pa. 236, 163 A. 523 (1932)).  We disagree. The ***Nanty-Glo*** rule instructs that "the party moving for summary judgment may not rely solely upon its own testimonial affidavits or depositions, or those of its witnesses, to establish the non-existence of genuine issues of material facts."  ***Dudley v. USX Corp.***, 606 A.2d 916, 918 (Pa.Super. 1992).  Here, LTC Associates' motion cited documentary evidence, including Mr. McDonald's "Time off Request Form."  Also, LTC Associates relied upon the deposition testimony of an adverse witness, Mr. McDonald.