PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-3162
_____

BRIAN A. DAVIS;
FREDRICKA K. BECKFORD,
Appellants

v.

GEORGE C. WIGEN, Former Warden, Moshannon Valley
Correctional Center;
THE GEO GROUP, INC.;
DONNA MELLENDICK, Former Administrator, Bureau of
Prisons
Privatization Management Branch;
DAVID O'NEILL, Assistant Field Director, Department of
Homeland Security
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 3-16-cv-00026
District Judge:  The Honorable Kim R. Gibson
_____

Argued December 13, 2022

Before: RESTREPO, McKEE, and SMITH,
*Circuit Judges*

(Filed: September 19, 2023)


Stephen A. Fogdall [ARGUED]
Dilworth Paxson
1500 Market Street
Suite 3500E
Philadelphia, PA 19102
        *Counsel for Appellants*


Dino L. LaVerghetta
Sidley Austin
1501 K Street, N.W.
Washington, DC 20005
        *Counsel for Amicus Appellants*


Morgan M.J. Randle
Teresa O. Sirianni
Marshall Dennehey Warner Coleman & Goggin
501 Grant Street
Union Trust Building, Suite 700
Pittsburgh, PA 15219

Thomas A. Specht [ARGUED]

2

Marshall Dennehy Warner Coleman & Goggin
P.O. Box 3118
Scranton, PA 18505

> *Counsel for Appellees George C. Wigen and*
> *GEO Group, Inc.*

Jacqueline C. Brown
Adam N. Hallowell [ARGUED]
Laura S. Irwin
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

> *Counsel for Appellees Donna Mellendick*
> *and David O'Neill*

———————————————

OPINION OF THE COURT
———————————————

SMITH, *Circuit Judge*.

Plaintiff-Appellants are a former federal inmate, Brian Davis, and his fiancée, Fredricka Beckford. Davis served four years of his sentence at Moshannon Valley Correctional Center, a private prison that primarily houses alien inmates. During that time, he submitted a request to the prison that he be permitted to marry Beckford. Moshannon Valley officials denied the request despite Davis's contention that he met all

requirements under the prison's marriage policy. Plaintiffs filed suit and now appeal the dismissal of three claims: (1) a claim under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1; (2) a claim under 42 U.S.C. § 1985; and (3) a claim for intentional infliction of emotional distress. We conclude that Plaintiffs have stated a RFRA claim, but that their other two claims fail. Accordingly, we will vacate the District Court's dismissal of Plaintiffs' RFRA claim as to the GEO Defendants, affirm the dismissal of that claim as to the Federal Defendants because they are entitled to qualified immunity, and affirm the remainder of the Court's order.

## I. Factual Background

We draw the following facts from averments in the Second Amended Complaint (SAC), which we accept as true for purposes of this appeal. Brian Davis and his fiancée Fredricka Beckford met when they were children. The two maintained a lifelong friendship, one that became a romantic relationship that lasted throughout Davis's extensive period of incarceration. Davis and Beckford are both of Jamaican descent, and while Beckford is a U.S. citizen, Davis is not.

In 1993, Davis was sentenced to life in prison for non-violent drug trafficking convictions. Despite the restrictiveness of Davis's life sentence, he and Beckford remained close throughout Davis's incarceration. Beckford wished to marry him, but Davis feared that he would never be able to support her because he expected to spend the remainder of his life in prison. But when his prison sentence was reduced to 30 years in 2008, Davis changed his mind about marriage. Because he

4

could then foresee an eventual release, Davis agreed to marry Beckford.

Davis and Beckford are both devout Christians. They allege that their desire to marry had "profound religious significance for them" and that they "viewed their marriage as an expression of that faith." JA 100.

Davis's reduced sentence qualified him for a transfer to a lower security prison. Accordingly, in 2012, he was moved from Federal Correctional Institute McKean to Moshannon Valley Correctional Center (Moshannon Valley). Moshannon Valley is a private prison that houses low-security alien inmates. The facility is operated by The GEO Group, Inc. (GEO Group), which contracts with the U.S. Bureau of Prisons (BOP) to house federal inmates. At least 98 percent of the inmate population at Moshannon Valley are noncitizens who are "faced with an impending immigration matter or have been ordered deported from the United States." JA 94.

Davis maintained the hope that, after his transfer, he and Beckford could be married. He sought to comply, then, with all of Moshannon Valley's marriage policy requirements. The written policy then in effect required that inmates be housed in general population and demonstrate good living skills, program participation, "clear conduct" for six months, and acceptable work performance. JA 110. If an inmate met those requirements, the prison psychologist and other prison officials were to indicate whether they approved or disapproved the request to marry. Plaintiffs allege that Moshannon Valley's policy "goes beyond" what BOP requires. JA 93.

5

Plaintiffs allege that Davis met each of these qualifications when he submitted his marriage request. Nevertheless, Moshannon Valley administrative personnel denied his request. Beckford also contacted the prison's officials and sought permission to marry Davis. Moshannon Valley denied her request as well.

Davis challenged the denial of his marriage request through the prison's administrative appeal process. When his appeal was denied, Davis contacted the Administrator of the BOP Privatization Management Branch, Donna Mellendick, seeking her intervention. Her office informed Davis in writing that the grant or denial of inmate marriage requests remained exclusively within the province of Moshannon Valley officials.

Davis eventually learned from discussions with the prison chaplain, as well as several Moshannon Valley employees and at least 20 other inmates, that Moshannon Valley had not approved a single inmate's request to marry since GEO Group began its contractual relationship with BOP. Plaintiffs accordingly allege that despite Moshannon Valley's official policy, its actual practice was to deny all marriage requests.

In 2015, Davis's sentence was again reduced, this time to 27 years. The sentence reduction was a mixed blessing. He was deported after his release the following year. Although Plaintiffs concede that their marriage would not have allowed Davis to challenge his deportation, they allege that marriage to

a U.S. citizen could provide a basis for other inmates at Moshannon Valley to challenge their orders of removal.[1]

Plaintiffs allege that BOP and DHS officials directed Moshannon Valley officials to deny all inmate marriage requests to ensure that marriage to a U.S. citizen would not interfere with deportation proceedings. Based on research and information they obtained from Moshannon Valley employees, Plaintiffs allege that those BOP and DHS officials are Defendants Donna Mellendick, the Administrator of the BOP Privatization Branch, and David O'Neill, the Assistant Director of the Philadelphia Field Office of U.S. Immigration and Customs Enforcement (collectively, Federal Defendants).

Plaintiffs also allege that GEO Group and George Wigen, the former warden of Moshannon Valley (collectively, GEO Defendants), have a financial incentive to prevent

---

[1] Under 8 U.S.C. § 1182(h)(1)(B), the Attorney General may in his discretion waive an alien's inadmissibility due to a conviction for a crime of moral turpitude if the alien is married to a U.S. citizen or lawful permanent resident and can show that "denial of admission would cause extreme hardship to the citizen or lawful[] resident." The Attorney General may not grant such a waiver if (1) the alien was convicted of "murder or criminal acts involving torture, or an attempt or conspiracy to commit murder or a criminal act involving torture"; or (2) if the alien had been admitted as a permanent resident but was later convicted of an aggravated felony or had not resided continuously in the United States for seven years before initiation of the removal proceedings. 8 U.S.C. § 1182(h)(2).

noncitizen inmates from marrying U.S. citizens because BOP's payments to Moshannon Valley are based on the number of inmates it houses. If noncitizen inmates were able to marry U.S. citizens, some might request a transfer out of Moshannon Valley, thereby lowering GEO Group's headcount.

Beckford further alleges that her inability to marry Davis caused her to suffer serious emotional distress. She contends that because she was not Davis's spouse, prison officials were not obligated to inform her of matters such as his transfer to another prison or his deportation. Beckford worried about Davis's safety in prison, and she claims that this lack of information compounded her concern. Plaintiffs allege that Beckford's emotional distress led to serious health consequences requiring hospitalization.

## II. Procedural Background

In January 2016, Plaintiffs filed a *pro se* complaint against the director of the BOP, the BOP, the administrator of the BOP Privatization Management Branch, Wigen, the current warden of Moshannon Valley, and GEO Group. Plaintiffs asserted an intentional infliction of emotional distress claim and several civil rights claims, principally under § 1983, *Bivens*,[2] and the Equal Protection Clause. Plaintiffs alleged that by refusing to allow them to marry, these Defendants discriminated against them based on their race and national origin. Plaintiffs sought both declaratory and monetary relief.

---

[2] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

Soon thereafter, and while still proceeding *pro se*, Plaintiffs filed an amended complaint adding a § 1985(3) claim. More than a year later, the District Court dismissed the case in its entirety for failure to prosecute because Plaintiffs had yet to serve the complaint on any of the Defendants. Plaintiffs successfully moved to reopen and then served all Defendants except the Federal Defendants.

The Defendants that had been served moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6). The District Court granted their motion and dismissed the case. It concluded that: the *Bivens* claims against GEO Defendants failed because those Defendants were not federal actors; the § 1985(3) claims failed because conspiracies under § 1985(3) involving private actors are limited to violations of the right to be free from involuntary servitude and the right to travel; the § 1983 claim failed for lack of state action; and the claims against the Federal Defendants failed for lack of prosecution.

Plaintiffs appealed and secured counsel in June 2020, prior to oral argument before this Court. We reversed in part. *Davis v. Samuels*, 962 F.3d 105 (3d Cir. 2020). We held that private parties engaging in "the federal equivalent of 'state action,'" like the private prison here, may be subject to *Bivens* liability. *Id.* at 112. Yet we affirmed the dismissal of the *Bivens* claim because "a remedy for the infringement of the right to marry" presented a new *Bivens* context and we declined to extend the reach of *Bivens*. *Id.* at 112–13 (citing *Ziglar v. Abbasi*, 582 U.S. 120 (2017)).

9

As to the § 1985(3) claim, we explained that the Supreme Court has limited purely private § 1985(3) conspiracies to violations of the right to be free from involuntary servitude and the right to travel. But because Plaintiffs alleged a conspiracy between the private prison and the federal government, those limitations did not apply. *Id.* at 113–14. We also held that § 1985(3) claims are available against those acting under color of federal law in addition to those acting under color of state law. *Id.* at 115. Taking no position on the merits of Plaintiffs' § 1985 claim, we vacated the District Court's dismissal of that claim. *Id.* at 114.

We also reversed the dismissal of the claims against the Federal Defendants for failure to prosecute. We concluded that the District Court had abused its discretion by failing to consider whether there was good cause to extend the deadline for Plaintiffs to serve the Federal Defendants under Rule 4(m). *Id.* at 116.

On remand, Plaintiffs filed their Second Amended Complaint—now the operative complaint—and served the Federal Defendants. In the SAC, Plaintiffs again asserted claims under §§ 1983 and 1985(3) and added a RFRA claim. Beckford also reasserted a claim for intentional infliction of emotional distress (IIED). Both sets of Defendants filed motions to dismiss. The District Court granted the motions and dismissed all claims.

Plaintiffs' § 1985(3) claim alleges conspiracy to discriminate based on race, national origin, and alienage. The District Court dismissed Plaintiffs' § 1985(3) race and national origin claims because the inmates at Moshannon Valley are not

10

all of the same race or national origin. The District Court dismissed the § 1985(3) alienage claim because Plaintiffs allege that 98 percent of the inmates were non-citizens, as opposed to the entire prison population. That, the District Court reasoned, made it implausible that Defendants discriminated based on alienage. The District Court also noted that even if 100 percent of inmates were non-citizens, Plaintiffs' § 1985(3) claim would still fail because alienage is a mutable characteristic and therefore not a protected class under § 1985(3).

As for the RFRA claim, the District Court first concluded, per our Court's prior opinion, that the GEO Defendants were federal actors subject to RFRA. Yet the Court dismissed the RFRA claim against all Defendants because Plaintiffs did not allege a substantial burden on their religious exercise. Citing this Court's opinion in *Washington v. Klem*, 497 F.3d 272 (3d Cir. 2007), the District Court concluded that Plaintiffs' inability to marry did not cause Plaintiffs to violate their religious beliefs and therefore did not rise to a substantial burden under RFRA.

Turning to Beckford's IIED claim, the District Court held that because the Federal Defendants acted within the scope of employment when they denied Davis's marriage request, the Liability Reform Act required that the United States stand in place of the Federal Defendants. *See* 28 U.S.C. § 2679(d)(1). The District Court then concluded that Beckford failed to exhaust her administrative remedies under the Liability Reform Act and dismissed the IIED claim against the United States. *See id.* § 2675(a). As for the IIED claim against

11

the GEO Defendants, the District Court concluded that Beckford failed to allege a physical manifestation of her emotional distress and failed to support that allegation with competent medical evidence as Pennsylvania law requires. The District Court therefore dismissed Beckford's IIED claim against the GEO Defendants. Finally, the District Court dismissed Plaintiffs' § 1983 claim because all Defendants were acting under color of federal law rather than state law.

This appeal followed. Plaintiffs challenge the dismissal of their § 1985(3) claim based on alienage, their RFRA claim, and Beckford's IIED claim against the GEO Defendants.

## III. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. We have jurisdiction under 28 U.S.C. § 1291. "We exercise plenary review over a district court's grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Talley v. Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021).

## IV. Discussion

### A. RFRA

The District Court dismissed Plaintiffs' RFRA claim because they failed to allege that Defendants pressured Plaintiffs to either refrain from conduct that their faith *prescribed* or participate in conduct that their faith *prohibited*. JA 27. The District Court drew these requirements from this Court's construction of "substantial burden" under the

12

Religious Land Use and Institutionalized Persons Act (RLUIPA) originally laid out in *Washington v. Klem*, 497 F.3d 272 (3d Cir. 2007).[3] Plaintiffs contend, however, that the District Court's reasoning cannot be correct because RFRA protects religious exercise whether or not it is "compelled by, or central to, a system of religious belief." *See* 42 U.S.C. § 2000cc-5(7)(A). Although the District Court's read of *Klem* is not unreasonable, we take this opportunity to clarify that a substantial burden under RFRA extends to non-mandatory religious conduct and expression, i.e. conduct or expression not "compelled by, or central to, a system of religious belief." Plaintiffs' marriage, as we discuss below, falls within that category.

### 1. Whether Plaintiffs State a RFRA Claim

RFRA provides that the government "shall not substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). The statute defines "exercise of religion" as the term is defined in the RLUIPA.[4] *Id.* § 2000bb-2(4). RLUIPA

---

[3] We later extended our construction of "substantial burden" under RLUIPA to RFRA. *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 n.103 (3d Cir. 2016).

[4] Congress enacted RFRA in the wake of the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). *See* 42 U.S.C. § 2000bb. As originally enacted, RFRA applied to both the state and federal government. *City of Boerne v. Flores*, 521 U.S. 507, 516 (1997). After the Supreme Court held in *City of Boerne* that Congress had exceeded its authority

defines "religious exercise" as including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A). Finally, these statutes must be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." *Id.* § 2000cc-3(g); *Hobby Lobby v. Burwell*, 573 U.S. 682, 696 & n.5 (2014) (explaining that this rule of construction applies to both RLUIPA and RFRA).

To state a prima facie RFRA claim, a plaintiff "must allege that the government (1) substantially burdened (2) a sincere (3) religious exercise." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016) (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006)). At the pleadings stage, a court asks only whether the plaintiff has plausibly alleged each element of his prima facie case. *See Castleberry v. STI Grp.*, 863 F.3d 259, 266 (3d Cir. 2017) (explaining that a claim of employment discrimination, which is subject to burden-shifting, "necessarily survives a motion to dismiss so long as the requisite *prima facie* elements have been established"). On a summary judgment motion or at trial, if the plaintiff makes an initial showing that the defendant substantially burdened his

---

by extending RFRA to the states, Congress enacted RLUIPA, which applies only to state land use regulation and state prisons. 42 U.S.C. §§ 2000cc, 2000cc-1; *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). RLUIPA also amended RFRA's definition of "exercise of religion." *See* 42 U.S.C. § 2000bb-2(4).

14

sincere religious exercise, then the burden shifts to the defendant to show that the offending policy is the least restrictive means of achieving a compelling government interest. 42 U.S.C. § 2000bb-1(b); *Holt v. Hobbs*, 574 U.S. 352, 363 (2015).

As noted, we first construed the phrase "substantial burden" under RLUIPA in *Washington v. Klem*, 497 F.3d at 280. Taking direction from a joint statement by RLUIPA's principal sponsors, we primarily looked to the Supreme Court's pre-*Smith* Free Exercise jurisprudence in formulating a definition.[5] *See id.* at 278 (citing 146 Cong. Rec. S7774, 7776 (statement of Sens. Hatch and Kennedy)). We settled on a "disjunctive test that couples the holdings of *Sherbert* and *Thomas*"[6] and noted that although other circuits had adopted similar tests with different wording, it remained an open question whether the semantic variations resulted in "any meaningful differences in application." *Id.* at 279–80. For our formulation of the test, we held that a "substantial burden" on religious exercise occurs when:

> 1) a follower is forced to choose between following the precepts of his religion and

---

[5] We note, however, that the Supreme Court later rejected the idea that "RFRA did no more than codify this Court's pre-*Smith* Free Exercise Clause precedents." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 713–16 (2014).

[6] *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707 (1981).

15

forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

*Id.* at 280. We later extended that construction to RFRA. *Mack*, 839 F.3d at 304 n.103.

Plaintiffs here raise a question that we have not previously addressed: whether an individual suffers a substantial burden on religious exercise when the particular religious exercise is not mandatory. Defendants contend the answer is no because under *Klem*, a burden is only "substantial" if it causes Plaintiffs to violate the precepts of their religion or mandatory religious beliefs. *See Klem*, 467 F.3d at 280. Because neither Christian tradition nor doctrine requires adherents to marry, Defendants argue that the denial of Plaintiffs' marriage request did not cause them to violate any religious precept or belief. Although such a read of our *Klem* opinion is not unreasonable, we cannot agree that *Klem*'s reach is so limited.

First, we acknowledged in *Klem* that "RLUIPA does not permit a court to determine whether the belief or practice in question is 'compelled by, or central to, a system of religious belief.'" *Id.* at 277 (quoting 42 U.S.C. § 2000cc-5(7)(A)). Indeed, RLUIPA and RFRA define "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *id.* § 2000bb-2(4). Given that the breadth of this

16

definition appears in a section of RLUIPA to which our *Klem* opinion expressly referred, it can hardly be gainsaid that we would not have taken that language into account when construing "substantial burden."

Second, as noted above, we explained in *Klem* that "semantic differences" between varying articulations of the *Sherbert*/*Thomas* test may not make a practical "difference in application." 497 F.3d at 279–80. Accordingly, in light of the statutory text, our use of the phrase "violate his beliefs" in prong two of *Klem* does not exclude non-mandatory religious conduct or beliefs.

Here, Plaintiffs desired to marry because marriage "had profound religious significance for them" and because they "viewed their marriage as an expression of" their Christian faith. JA 100. Although marriage may not be required of every Christian, Plaintiffs allege that their desire to marry has significant religious meaning for them. They contend that marriage is an expression of their faith. By denying Plaintiffs' marriage request, Defendants caused them to refrain from such religious expression and thereby "violate their beliefs." *See Klem*, 497 F.3d at 280.

There can hardly be a more substantial burden on a religious practice or exercise than its outright prohibition. *See Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014) ("The greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)."). While not every government-imposed hurdle to the practice of sincere faith-based conduct will be a substantial burden, the more proximate the government action is to an outright bar, the more

17

likely it is a substantial burden. We conclude, therefore, that Plaintiffs have adequately alleged a substantial burden on their religious beliefs.

Defendants raise several additional arguments that are not appropriate for resolution at this stage of the litigation. The GEO Defendants contend that even if RFRA protects Plaintiffs' desire to marry, Moshannon Valley's marriage policy imposed no substantial pressure because it conditioned approval of a prisoner's request to marry only on whether the prisoner met certain behavioral requirements. This argument disputes factual allegations in the complaint. Plaintiffs allege that despite Moshannon Valley's official policy, its actual practice was to routinely deny all marriage requests regardless of whether the inmate had met the prison's requirements of good behavior. JA 93–94. Plaintiffs also allege that Davis met those requirements. JA 92. Accepting those allegations as true, Moshannon Valley prohibited Plaintiffs from marrying throughout Davis's four years at the prison. This prohibition, as explained above, satisfies the substantial burden prong of a RFRA claim. *See Haight*, 763 F.3d at 565.

Next, the GEO Defendants argue that even if Plaintiffs state a prima facie RFRA claim, we should still affirm the dismissal of that claim because Defendants have shown that the no-marriage policy was narrowly tailored to a compelling government interest. This is not the time to resolve that issue, nor are we presented with a record that would allow us to do so. Whether Moshannon Valley's practice of denying marriage requests is supported by a compelling interest (such as penological concerns, safety concerns, or something else), and

18

whether it is narrowly tailored to that interest are questions that necessarily require us to look beyond the mere allegations of a complaint. *See Castleberry*, 863 F.3d at 266.

Finally, the Federal Defendants challenge the sincerity of Plaintiffs' beliefs and argue that Plaintiffs did not actually want to marry for religious reasons. But at the pleadings stage, we must accept Plaintiffs' plausible allegations as true and draw all inferences in their favor. If Defendants wish to challenge Plaintiffs' sincerity, they may do so at a later stage in the proceedings. *See Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (noting that the defendants may challenge the alleged sincerity of the plaintiff's religious belief, but not in response to a motion to dismiss).

## 2. Whether RFRA Applies to the GEO Defendants

Finally, the GEO Defendants argue that even if Plaintiffs state a RFRA claim, the GEO Defendants are not subject to RFRA because they do not meet RFRA's definition of "government." RFRA prohibits the "government" from substantially burdening religious exercise without a compelling interest. 42 U.S.C. § 2000bb-1(a). RFRA defines "government" as "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." *Id.* § 2000bb-2.

Though GEO Group is a private corporation, it contracts with the Bureau of Prisons to house low-security alien inmates. Wigen served as warden of Moshannon Valley during Davis's

19

time there. By operating a prison containing federal inmates, GEO Group and Wigen acted as "instrumentalities" of the federal government.

Moreover, this Court already held in Plaintiffs' previous appeal that the GEO Defendants were federal actors for purposes of Plaintiffs' *Bivens* claim. *Davis*, 962 F.3d at 112. Defendants have identified no meaningful distinction between the state action doctrine and RFRA's definition of "government" such that the GEO Defendants could be subject to liability pursuant to *Bivens* but not for a RFRA claim. We conclude that RFRA applies to the GEO Defendants.

### 3. Qualified Immunity

The Federal Defendants argue that they are entitled to qualified immunity as to Plaintiffs' RFRA claim because the law was not clearly established when Moshannon Valley denied Davis's marriage request. As we have acknowledged, Defendants' and the District Court's read of *Klem* was not unreasonable. So, in light of our articulation of the test in *Klem*, we cannot conclude that it was clearly established that a prison imposes a substantial burden on its inmates by prohibiting participation in non-mandatory religious conduct. The Federal Defendants are therefore entitled to qualified immunity as to Plaintiffs' RFRA claim. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding that qualified immunity protects government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). Accordingly, we need not address Mellendick's argument that she was not timely served.

20

**B.  Section 1985(3)**

Plaintiffs also appeal the dismissal of their § 1985(3) claim based only on alienage.[7] To state a claim under § 1985(3), the plaintiff must allege:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 828–29 (1983). To allege that the defendant deprived a class of persons of equal protection of the laws, the plaintiff must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

As a threshold matter, we note that while Plaintiffs appeal the dismissal of their § 1985(3) claim based on alienage, Beckford is a citizen. She cannot, therefore, state a § 1985(3) claim based on alienage.

---

[7] Plaintiffs do not appeal the dismissal of their § 1985(3) claim based on race and national origin.

21

As for Davis, he alleges that the GEO and Federal Defendants "conspired to deprive, either directly or indirectly, MVCC alien inmates of the equal protection of the laws" in violation of § 1985(3). JA 98. Davis therefore asks us to recognize alienage as a protected class under § 1985(3). But we need not reach that question because Davis fails to plausibly allege that Defendants deprived Moshannon Valley inmates of the right to marry *because of* their status as noncitizens.

In *Bray v. Alexandria Women's Health Clinic*, the Supreme Court held that a plaintiff asserting a § 1985(3) claim must allege "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." 506 U.S. 263, 272–73 (1993) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). The Supreme Court later elaborated on that same standard in *Ashcroft v. Iqbal*, holding that to plausibly allege discrimination "because of" a protected characteristic, the plaintiff "must plead sufficient factual matter" to show that the defendants took the challenged action "not for a neutral . . . reason but for the purpose of discriminating on account" of the protected characteristic. 556 U.S. 662, 677 (2009).

Davis has not alleged sufficient facts to make it plausible that Moshannon Valley's practice of denying inmate marriage requests was motivated by Defendants' intent to discriminate against aliens. True, Davis alleges that nearly all Moshannon Valley inmates are aliens. JA 94. And some of those inmates may be able to challenge their deportation orders after marrying a U.S. citizen. *Id.* But the simple fact that the

22

challenged conduct applies to a group that happens to share a protected characteristic does not, by itself, mean that the conduct was taken because of the group's protected characteristic.

*Bray* offers an illustration of this principle. In *Bray*, certain abortion clinics sought to enjoin individuals from conducting demonstrations in opposition to abortion. 506 U.S. at 266. The clinics asserted a § 1985(3) claim on the theory that the demonstrators had conspired to discriminate against two alternative classes: "women seeking abortion" or "women" more generally. *Id.* at 269–70. The Supreme Court rejected both theories. As to the second theory, the Supreme Court held that it need not decide whether § 1985(3) protects women as a class because the defendants' opposition to abortion did not amount to invidious animus against women. *Id.* at 269. The Court explained that the plaintiffs failed to show that the demonstrations were motivated by animus against women "*by reason of their sex*." *Id.* And the fact that the plaintiffs alleged that only persons of one sex sought abortions did not mean that "disfavoring of abortion" is "*ipso facto* sex discrimination." *Id.* at 272–73. Instead, the Court believed that opposition to abortion could be viewed as a "value judgment" unmotivated by animus against one sex. *Id.* at 272–74.

Here, similarly, even if § 1985(3) were construed to protect alienage, an alleged discriminatory policy that applies to a prison population comprised almost exclusively of aliens does not alone give rise to the plausible inference that

23

Defendants harbored animus toward aliens.[8] As in *Bray*, Davis has not alleged additional facts showing that Defendants implemented the no-marriage policy *because of* Moshannon Valley inmates' alien status. For example, an allegation that Defendants used more favorable marriage policies in prisons holding citizen inmates could elevate Davis's allegations of animus from the merely possible to the realm of the plausible. But here, we have only an allegation that the government instructed a private contractor to restrict the ability of incarcerated individuals to marry. So, the bare allegation that Moshannon Valley denies all marriage requests at the Federal Defendants' direction, without more, fails to show animus toward Moshannon Valley inmates because of their alien status. *See also Dean v. Warren*, 12 F.4th 1248, 1257–64 (11th Cir. 2021) (extensively analyzing *Bray* and rejecting the plaintiff's § 1985(3) claim because it did not "clear the high bar established in *Bray* for alleging invidious discriminatory animus against" the alleged class).

Moreover, some of Davis's allegations counsel against drawing an inference of animus. Davis alleges that for most inmates, including himself, marriage to a U.S. citizen would not allow an effective challenge to deportation, JA 94, and Moshannon Valley's documented marriage policy

---

[8] To be clear, we do not subscribe to the District Court's reasoning that Plaintiffs' § 1985(3) claim fails because they allege that only 98 percent of Moshannon Valley inmates, as opposed to 100 percent, are aliens. The fact that Moshannon Valley may house a small percentage of citizen inmates does not alone undermine Plaintiffs' § 1985(3) claim.

acknowledges as much, JA 113 ("The majority of the inmates serving their sentences at MVCC are foreign nationals and will be advised that the marriages will not have any effect on their citizenship status or their pending deportation proceedings."). This belies Davis's assertion that Moshannon Valley's marriage policy is part of a conspiracy to prevent noncitizens from marrying U.S. citizens.

We conclude, therefore, that Davis has failed to state a § 1985(3) claim. We leave for another day the important question of whether § 1985(3) protects alienage.

## C. Intentional Infliction of Emotional Distress

Beckford asserts a state law claim of intentional infliction of emotional distress (IIED) based on alleged psychic injuries stemming from her inability to marry Davis. Beckford does not appeal the dismissal of her IIED claim against the Federal Defendants. As for the GEO Defendants, Beckford challenges the District Court's conclusion that she has not alleged any physical manifestation of her emotional distress and has not "alluded to any competent medical evidence of any physical or emotional harm." JA 34.

We will affirm the dismissal of Beckford's IIED claim, but for a different reason than that stated by the District Court. To state a claim for IIED under Pennsylvania law, the plaintiff must allege "intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff" and "some type of resulting physical harm due to the defendant's conduct." *Swisher v. Pitz*, 868 A.2d 1228, 1230

25

(Pa. Super. 2005) (quoting *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122 (Pa. Super. 2004)).

Beckford's IIED claim fails because the GEO Defendants' conduct is not the sort of behavior that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)). Liability attaches "for only the most clearly desperate and ultra extreme conduct." *Id.* at 754. The GEO Defendants' decision to deny Plaintiffs' marriage request simply does not rise to that level. We will therefore affirm the dismissal of Beckford's IIED claim.

**V. Conclusion**

We will vacate in part and affirm in part. We will vacate the dismissal of Plaintiffs' RFRA claim as to the GEO Defendants; affirm the dismissal of Plaintiffs' RFRA claim as to the Federal Defendants; affirm the dismissal of Plaintiffs' § 1985(3) claim and the dismissal of Beckford's IIED claim; and remand to the District Court for further proceedings consistent with the foregoing opinion.

26