**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2056
_____

JENNIFER OLDHAM,
Appellant

v.

THE PENNSYLVANIA STATE UNIVERSITY;
WIESLAW R. GLON, as agent for Penn State in his official
capacity and in his individual capacity; CHRISTOPHER J.
HARRIS, Esq., as agent for Penn State in his official
capacity; GEORGE G. ABASHIDZE, as agent for Penn State
in his official capacity and in his individual capacity
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 4:20-cv-02364)
District Judge:  Honorable Matthew W. Brann
_____

Argued:  March 23, 2023

Before:  RESTREPO, PHIPPS, and ROTH, *Circuit Judges*

(Filed: May 29, 2025)
_____

Cathy E. Crosson     **[ARGUED]**
406 South Eastside Drive
Bloomington, IN 47401

Stephen Lindsay
LINDSAY LAW
46 Haywood Street
Asheville, NC 28801

Kerstin W. Sutton
3215 Deerchase Wynd
Durham, NC 27712

> *Counsel for Appellant*

James A. Keller
Patrick F. Nugent
Amy L. Piccola     **[ARGUED]**
Shane P. Simon
SAUL EWING
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA 19102

> *Counsel for Appellees Penn State University*
> *and Christopher J. Harris*

Michael J. Engle
Jeffrey A. Lutsky     **[ARGUED]**
Corey S. D. Norcross
STRADLEY RONON STEVENS & YOUNG
2005 Market Street
Suite 2600
Philadelphia, PA 19103

*Counsel for Appellee Wieslaw R. Glon*

Lee G. Valigorsky   **[ARGUED]**
GLEASON CHERRY & CHERRY
1 North Franklin Street
P.O. Box 505
DuBois, PA 15801

*Counsel for Appellee George G. Abashidze*

_____

OPINION OF THE COURT
_____

PHIPPS, *Circuit Judge*.

This case arises from allegations that during a cross-country flight following a fencing tournament, a state university's assistant fencing coach sexually harassed and assaulted the woman in the seat next to him. That woman was also a member of the fencing community: she was a coach at a private fencing school that she owned. She alleges that when she told the university's head fencing coach about this incident, the coach rebuffed her, pressured her not to report it, and then along with the assistant coach initiated a retaliation campaign against her within the fencing community. Even more, she claims that when the university eventually investigated the

matter in response to her formal complaint, it confirmed the truth of her assertions but concluded that the assistant coach had not violated any university policy.

Based on those allegations, the private fencing coach sued the university, the two coaches, and the university's Title IX coordinator in the federal district where she resided, even though neither the university nor any of the sued employees resided in that state. She claimed that the defendants violated Title IX of the Education Amendments of 1972, and she also brought several state-law tort claims. All of the defendants moved to dismiss the complaint for failure to state a claim for relief, and all but one of the defendants – the assistant fencing coach – also challenged venue in at least one respect, such as by moving to dismiss the case for improper venue or by moving to transfer the case for either improper venue or the convenience of the parties. In response to those motions, the district court transferred the case to a new judicial district – partially to cure improper venue with respect to the head coach, the Title IX coordinator, and the state university, and partially for judicial efficiency with respect to the assistant coach.

After the transfer, the plaintiff amended her complaint, and the defendants moved to dismiss the claims against them. The transferee district court dismissed the entire suit. As a matter of first impression, it held that to bring a Title IX claim, a plaintiff must be within the zone of interests protected by that statute and that the plaintiff – as neither a student nor an employee of the university – was outside of that zone. As for the state-law tort claims, the transferee district court applied the choice-of-law rules of the transferee forum and dismissed all of those claims as untimely or implausible.

On *de novo* review, most of those conclusions are correct. A Title IX claim must be within the zone of interests protected by that statute. But the student-or-employee formulation of the Title IX zone-of-interests test is inaccurate, and under a correct understanding of the zone of interests protected by Title IX, the

4

private fencing coach's Title IX claims against the university related to her exclusion from fencing events that were hosted or supervised by the university, as well as any aspects of the retaliation campaign that occurred or had harm therefrom manifested on campus, are within that zone. Also, many of the state-law tort claims are untimely or fail to state a plausible claim for relief. But because the claims against the university's assistant fencing coach were transferred for judicial efficiency, the choice-of-law rules for the transferor, not the transferee, forum apply. And application of those rules allows for a longer statute of limitations such that the tort claims against the assistant coach are not time barred. Thus, as elaborated below, we will vacate in part, affirm in part, and remand for further proceedings.

## I. FACTUAL BACKGROUND
### (AS ALLEGED IN THE AMENDED COMPLAINT)

### A. The Return Flight from a Portland Fencing Tournament

In early December 2017, USA Fencing – the official national governing body for the sport of fencing in the United States[1] – held a North American Cup fencing competition in Portland, Oregon. Jennifer Oldham, the head coach and owner of a private fencing club in Durham, North Carolina, attended the tournament. George Abashidze, an assistant fencing coach at the Pennsylvania State University, also attended.

After the tournament, Oldham, Abashidze, and another member of the fencing community boarded a red-eye flight from Portland to Chicago and were seated in the same row.

---

[1] *See* Amateur Sports Act of 1978, Pub. L. No. 95-606, sec. 2, § 201, 92 Stat. 3045, 3050 (1978); USA Fencing, *United States Fencing Association Bylaws* § 2.1 (2024), https://www.usafencing.org/by-laws (choose "United States Fencing Association Bylaws – Effective September 15, 2024") [https://perma.cc/VEP5-QYLF].

Oldham had the middle seat, Abashidze was to her left in the aisle seat, and the other fencing acquaintance was to her right in the window seat.

Abashidze abused his proximity to Oldham. He made lewd comments to her. He touched her legs, arms, and face without her consent. And he repeatedly demanded that she have sex with him – during the flight. Even more, in the early morning hours of December 12, 2017, while the airplane was over the Great Plains, he thrust his hand between her legs and grabbed her genitalia without her consent.

### B. The Initial Aftermath of the Events on the Flight

Upon her return home to North Carolina, Oldham told her husband what Abashidze had done to her. She later reached out to her mentor and former fencing coach for advice on how to deal with the incident. Her mentor was a long-time friend of Wieslaw Glon, the head fencing coach at Penn State, and in January 2018, he spoke over the phone to Glon about Abashidze's verbal and physical harassment of Oldham on the flight. Despite that conversation, Glon did not report the misconduct to Penn State's Title IX Coordinator or to anyone in the hierarchy of the Penn State Athletic Department.

In February 2018, there was a collegiate fencing tournament in Durham. Both Glon and Abashidze attended that event as part of their employment with Penn State. While in town, Glon met with Oldham, and she told him what happened on the flight from Portland. She also handed Glon a written account of the incident and watched as he read it. After providing Glon with that information, Oldham asked whether he would report the incident to Penn State's Athletic Department. Glon refused, and in addition, he discouraged Oldham from reporting the incident to SafeSport, an independent organization that investigates and has the exclusive authority to respond to claims of sexual misconduct for USA Fencing. He told her that it would be embarrassing

6

for her if the incident were made known and that no one would believe her. Glon then brought Abashidze into the conversation and directed him to apologize to Oldham.

After that meeting, Oldham did not report the incident to SafeSport or to Penn State's Title IX Coordinator. But unbeknownst to Oldham, the passenger in the window seat on the flight from Portland had already reported the incident to SafeSport.

In April 2018, another fencing tournament brought Glon, Oldham, and Oldham's mentor to Richmond, Virginia. At the prompting of Oldham's mentor, the three of them had coffee together. Glon again discouraged Oldham from reporting the incident to SafeSport for the same reasons as before. He also urged her to refute allegations by the third-party witness if questioned by SafeSport. Glon then communicated the anxiety, stress, and loss of sleep that Abashidze was experiencing. Oldham told Glon that he had a duty to report the incident to Penn State. Glon disagreed and explained that he was watching Abashidze closely and did not believe him to be a danger to the team.

Over the next few months, there were several developments related to the incidents on the December 2017 flight. On June 30, 2018, without Oldham's knowledge, her husband, also a fencing professional, emailed Penn State's Athletic Director about it. Around the same time, SafeSport substantiated the report of Abashidze's verbal and physical harassment of Oldham, and it suspended Abashidze from any association or involvement with USA Fencing-sanctioned events taking place in 2018. Abashidze appealed that suspension, which led to the scheduling of an arbitration hearing. And on August 14, 2018, in response to an email from Oldham's husband, Penn State's Title IX Coordinator, Christopher Harris, interviewed Oldham over the phone about Abashidze's conduct and Glon's failure to report it.

## C. Efforts to Discredit Oldham

Around that same time, Glon and Abashidze were accusing Oldham of fabricating the verbal and physical harassment based on nothing more than a brushing of arms on a plane. In addition, at the SafeSport arbitration hearing in December 2018, both Glon and Abashidze called Oldham a liar.

Oldham felt the effects of those developments. Members of the fencing community, including Oldham's mentor, doubted her account, and she began to be shunned at fencing events. In addition, some of her colleagues in the fencing community were openly hostile toward her and spread Glon and Abashidze's accusations. Also, in pursuit of her professional aspirations, Oldham had applied for coaching positions at the University of North Carolina and Northwestern University, and despite her qualifications, she received no offers. She later heard that Glon had directly interfered with her candidacy for one of those positions – the coaching job at the University of North Carolina, her *alma mater*.

In response to that hostility and in fear of further retaliation, Oldham decided against going to fencing events that she otherwise would have attended. In particular, she did not attend a fencing tournament at Penn State on November 3, 2018. Nor did she attend the NCAA fencing championship in March 2021, which Penn State hosted.

Oldham did receive some, albeit incomplete, vindication. SafeSport, after Abashidze's arbitration hearing, determined that Abashidze was responsible for the verbal and physical harassment of Oldham and affirmed his suspension. Also, Penn State's February 2019 Title IX investigation substantiated the verbal and physical harassment. However, Penn State also concluded that Abashidze's conduct did not violate university policy. On a phone call with Harris before that initial determination became final, Oldham communicated her disagreement with that conclusion. But Penn State's final

determination reached the same conclusions as its initial decision. Dissatisfied with this result, in April 2019, Oldham submitted a written Title IX complaint against Glon for his response to Abashidze's conduct on the December 2017 flight. After receiving that complaint, Penn State did not communicate with Oldham about it.

## II.  PROCEDURAL HISTORY

### A. Commencement of Suit in the Middle District of North Carolina

On May 27, 2020, Oldham sued Abashidze, Glon, Harris, and Penn State in the United States District Court for the Middle District of North Carolina. She brought claims under the implied right of action for Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, § 901(a), 86 Stat. 235, 373 (1972) (codified in relevant part as amended at 20 U.S.C. § 1681). *See generally Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979) (recognizing an implied right of action for violations of Title IX). She also brought claims for battery, negligence, failure to supervise and train, and infliction of emotional distress. That district court had original jurisdiction over the Title IX claims because they arose under a federal law, *see* 28 U.S.C. § 1331, and it had supplemental jurisdiction over the state-law claims because those were related to her Title IX claims, *see id.* § 1367(a).[2]

---

[2] Oldham also invoked diversity jurisdiction, *see* 28 U.S.C. § 1332(a)(1), and her allegations support complete diversity of citizenship between herself and each of the defendants, *see Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806), as well as an amount in controversy that is not "to a legal certainty" below the threshold required for diversity jurisdiction, *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938). *See generally* 28 U.S.C. § 1332(a) (predicating diversity jurisdiction on claims between completely diverse parties with a value in excess of $75,000).

Defendants filed three separate motions to dismiss that complaint. Harris and Penn State jointly moved to dismiss for lack of personal jurisdiction, *see* Fed. R. Civ. P. 12(b)(2), improper venue, *see id.* 12(b)(3), and failure to state a claim, *see id.* 12(b)(6). In the alternative, they moved to transfer venue to the Middle District of Pennsylvania under 28 U.S.C. § 1404(a), which permits a transfer to another judicial district where the case could have been brought "[f]or the convenience of parties and witnesses, in the interests of justice." In his own motion, Glon also moved to dismiss for lack of personal jurisdiction, *see* Fed. R. Civ. P. 12(b)(2), improper venue, *see id.* 12(b)(3), and failure to state a claim, *see id.* 12(b)(6). As an alternative, Glon sought a transfer to the Middle District of Pennsylvania under either 28 U.S.C. § 1406(a) because the Middle District of North Carolina was the wrong venue or under § 1404(a) for convenience. Abashidze also moved to dismiss the case but only for a lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2).

That briefing convinced the district court in the Middle District of North Carolina that venue was not proper – only the February 2018 meeting between Oldham, Glon, and Abashidze took place there. *Oldham v. Pa. State Univ.*, 507 F. Supp. 3d 637, 645–47 (M.D.N.C. 2020) (hereinafter '*Oldham I*'). To remedy that venue problem, the court made a hybrid transfer. It relied on the defect-curing transfer statute, 28 U.S.C. § 1406(a), to transfer the claims against Glon, Harris, and Penn State – each of whom had moved to transfer venue in the alternative – to the Middle District of Pennsylvania. *Oldham I*, 507 F. Supp. 3d at 649.[3] And instead of severing the claims against Abashidze – who did not move to transfer venue – the court *sua sponte* invoked the convenience-transfer statute, 28 U.S.C. § 1404, to transfer those claims to the Middle District of Pennsylvania as well. *Oldham I*, 507 F. Supp. 3d at

---

[3] This transfer pursuant to 28 U.S.C. § 1406(a) was partially made *sua sponte* as only Glon had specifically requested a transfer under § 1406(a).

650. No party sought review of those rulings in the Fourth Circuit.

### B. The Litigation in the Middle District of Pennsylvania

On September 28, 2021, after the transfer of venue, Oldham amended her complaint. That pleading had two counts for violations of Title IX against all defendants: one for deliberate indifference to discrimination (Count I) and the other for exclusion from university programs and activities (Count II). The remaining five counts were for tort claims under state law: for defamation against everyone except Harris (Count III); breaches of the duties to supervise and to train against everyone except Abashidze (Count IV); battery against Abashidze and Penn State (Count V); negligence and gross negligence against all four defendants (Count VI); and negligent and intentional infliction of emotional distress against all four defendants (Count VII).

The defendants moved to dismiss all of Oldham's claims. They contested the plausibility of the Title IX claims and the state-law tort claims. They also disputed the timeliness of the defamation claim, which is subject to a one-year statute of limitations in both North Carolina and Pennsylvania. They further challenged the timeliness of Oldham's remaining state-law tort claims on the grounds that those claims were subject to Pennsylvania's two-year statute of limitations – not North Carolina's three-year statute of limitations.

The District Court granted those motions. *Oldham v. Pa. State Univ.*, 2022 WL 1528305, at *29 (M.D. Pa. May 13, 2022) (hereinafter '*Oldham II*'). It rejected the Title IX claims (Counts I and II) against Abashidze, Glon, and Harris because Title IX does not impose individual-capacity liability. *Id.* at *17. And it dismissed the Title IX claims against Penn State because Oldham, as neither a student nor an employee, was not in the zone of interests protected by Title IX. *Id.* at *18–19.

11

The District Court resolved the state-law tort claims on timeliness and sufficiency-of-pleadings grounds. It determined that the defamation claim (Count III) was subject to a one-year statute of limitations under either North Carolina or Pennsylvania law, so it dismissed that count without prejudice because Oldham did not plead any plausible claims within that period. *Id.* at \*6, 13, 20–22. For the other tort claims, the District Court applied Pennsylvania's two-year statute of limitations instead of North Carolina's three-year statute of limitations. *Id.* at \*6. Using that limitations period, the District Court dismissed without prejudice the claim for failure to train and supervise (Count IV) against Glon, Harris, and Penn State because Oldham did not allege facts that would make such a claim plausible within that time period. *Id.* at \*13–15, 22–24. And for the remaining tort claims – battery (Count V), negligence (Count VI), and infliction of emotional distress (Count VII) – the District Court dismissed those with prejudice after concluding that Oldham failed to plausibly allege conduct within the limitations period sufficient to sustain those counts. *Id.* at \*15–17, 25–29.

In response to that ruling, Oldham elected not to amend her allegations for the two claims dismissed without prejudice – defamation and failure to train or supervise. Instead, she notified the District Court that she would stand on those allegations. The District Court then dismissed those claims with prejudice on June 28, 2022.

Through a notice of appeal filed on June 1, 2022, and amended July 6, 2022, Oldham timely invoked this Court's appellate jurisdiction over the District Court's final decision. *See* 28 U.S.C. § 1291; Fed. R. App. P. 4(a)(1)(A). Oldham now challenges the District Court's dismissal of all of her claims except the individual-capacity Title IX claims against Abashidze, Glon, and Harris. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) (explaining that Title IX does not authorize suits against individuals).

12

## III. DISCUSSION

### A. Some of the Title IX Claims Against Penn State Are Within the Zone of Interests Protected by Title IX.

The District Court dismissed Oldham's Title IX claims against Penn State on the ground that she was not within the zone of interests that the statute was designed to protect. *Oldham II*, 2022 WL 1528305, at \*18–19. Under this Court's tripartite approach to motions to dismiss for failure to state a claim for relief, the first step is to identify the elements – or at a minimum the challenged element – of each claim. *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327–28 (3d Cir. 2022) (explaining all three steps). Consistent with that approach, the District Court, citing the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), reasoned that a plaintiff must fall within the zone of interests protected by Title IX as a prerequisite to stating a claim for relief under Title IX's implied cause of action. *Oldham II*, 2022 WL 1528305, at \*18 & nn.209–10. *See generally Lexmark*, 572 U.S. at 129 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).[4] In applying that zone-of-interests test at the motion-to-dismiss stage, the District Court reasoned that only students, employees, or persons "so closely tied to a university that [they are] essentially [students]" of an educational institution receiving federal funding are within the zone of interests protected by Title IX. *Oldham II*, 2022 WL 1528305, at \*18

---

[4] *See generally Cannon*, 441 U.S. at 689–709 (concluding that all four factors identified in *Cort v. Ash*, 422 U.S. 66, 78 (1975), were satisfied such that a cause of action could be implied from Title IX); *Alexander v. Sandoval*, 532 U.S. 275, 282 (2001) (explaining that *Cannon* held "that Title IX created a private right of action to enforce its ban on intentional discrimination"). *Cf. generally Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 71 (1992) (describing how "[Title IX] supported no express right of action").

(quoting *Doe v. Univ. of Ky.*, 971 F.3d 553, 559 n.4 (6th Cir. 2020)). Although it did not disregard any of Oldham's allegations as speculative or too conclusory,[5] the District Court determined that Oldham did not plausibly allege that she was a student or an employee or that she had a similarly close relationship with Penn State.[6] The District Court therefore concluded that Oldham was outside of the zone of interests protected by Title IX, and it dismissed her Title IX claims with prejudice. *See id.* at *19.

That ruling presents a question of first impression for this Court, *viz.*, whether the zone-of-interests test applies to Title IX claims. For the reasons below, it does, and some of Oldham's claims are plausibly within that zone.

Although similar considerations have deep roots in the common law,[7] the Supreme Court originally developed the

---

[5] *See Lutz*, 49 F.4th at 327–28 (describing the second step of the motion-to-dismiss analysis as "reviewing the complaint and disregarding any formulaic recitation of the elements of a claim or other legal conclusion, as well as allegations that are so threadbare or speculative that they fail to cross the line between the conclusory and the factual" (cleaned up)).

[6] *See Lutz*, 49 F.4th at 328 (explaining that under step three of the motion-to-dismiss analysis, a court "evaluates the plausibility of the remaining allegations" while "assuming their veracity, construing them in the light most favorable to the plaintiff, and drawing all reasonable inferences in the plaintiff's favor").

[7] *See Lexmark*, 572 U.S. at 130 n.5 ("Although we announced the modern zone-of-interests test in 1971, its roots lie in the common-law rule that a plaintiff may not recover under the law of negligence for injuries caused by violation of a statute unless the statute 'is interpreted as designed to protect the class of persons in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its

14

zone-of-interests test as a means of determining who could sue a federal agency under the Administrative Procedure Act.  *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (construing 5 U.S.C. § 702); *see also* Alisa B. Klein, *Major Questions Doctrine Jujitsu: Using the Doctrine to Rein in District Court Judges*, 76 Admin. L. Rev. 327, 363–64 (2024) ("*Lexmark* explained that the 'zone of interests' test originated 'as a limitation on the cause of action for judicial review conferred by the Administrative Procedure Act.'" (quoting *Lexmark*, 572 U.S. at 129)).  But the Supreme Court "ha[s] since made clear" that zone-of-interests considerations "appl[y] to *all* statutorily created causes of action . . . 'unless . . . expressly negated.'"  *Lexmark*, 572 U.S. at 129 (emphasis added) (quoting *Bennett v. Spear*, 520 U.S. 154, 163 (1997)).  Accordingly, it is now "presume[d] that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'"  *Id.* (quoting *Allen*, 468 U.S. at 757).[8]  In analyzing another federal

violation.'" (quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Law of Torts* § 36 (5th ed. 1984)) (also citing *Gorris v. Scott*, [1874] 9 L.R. Exch. 125, 125 (Eng.))); *see also* Restatement (Second) of Torts § 286 (Am. L. Inst. 1965) (describing how the common-law negligence *per se* test applies if the statute's purpose is "to protect that interest against the kind of harm which has resulted" and "to protect that interest against the particular hazard from which the harm results").

[8] When a statute provides a cause of action for an 'aggrieved person,' a term used in the Administrative Procedure Act, *see* 5 U.S.C. § 702, the Supreme Court uses a slightly relaxed version of the zone-of-interests test that was derived from the APA.  That version of the test examines whether a plaintiff is "*arguably* within the zone of interests" protected by the statute. *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 197 (2017) (quoting *Ass'n of Data Processing*, 397 U.S. at 153) (applying the 'arguably' formulation of the zone-of-interests text to the Fair Housing Act, which uses the term 'aggrieved person'); *see*

civil rights statute, the Fair Housing Act, the Supreme Court did not reject the presumptive application of the zone-of-interests test, *see Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 197 (2017) (citing 42 U.S.C. §§ 3602(i), 3604(b), 3605(a), 3613(a)(1)(A), (c)(1)), as neither the text of the statute nor its later amendments "suggest[ed] that Congress intended to deviate from the zone-of-interests limitation," *id.* at 205 (Thomas, J., concurring in part and dissenting in part). The presumptive application of the zone-of-interests test is similarly not rebutted with respect to Title IX's implied cause of action: nothing in that statute's original text or its later amendments suggests an intention to deviate from the common-law rule. *See* 20 U.S.C. §§ 1681, 1687. Thus, the zone-of-interests test applies to Title IX, and only those persons within the zone of interests it protects are eligible to sue under its implied cause of action.

Determining whether a person is within the zone of interests protected by a statute requires analyzing the statute's text, construed "using traditional tools of statutory

---

*also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012) (applying the 'arguably' formulation of the zone-of-interests test to an APA claim); *Ass'n of Data Processing*, 397 U.S. at 153 (articulating the 'arguably' formulation of the zone-of-interests test for a claim under the APA); *cf. Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987) (explaining that the 'arguably' formulation of the zone-of-interests test "is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff" (footnote omitted)). Because Title IX, like the statute at issue in *Lexmark*, the Lanham Act, *see Lexmark*, 572 U.S. at 122 (citing 15 U.S.C. § 1125(a)), does not use the term 'aggrieved person,' the standard formulation of the zone-of-interests test applies.

interpretation." *Lexmark*, 572 U.S. at 127; *see United States v. Hallinan*, 75 F.4th 148, 151 (3d Cir. 2023) (citing *Lexmark*, 572 U.S. at 127); *see also N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 520 (1982) ("[The] starting point in determining the scope of Title IX is, of course, the statutory language."). Applied to Title IX, much of its protective sweep comes from its prohibition of discriminatory actions taken on the basis of sex with respect to federally funded education programs or activities:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination *under* any education *program or activity* receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a) (emphasis added); *see also id.* § 1681(a)(1)–(9) (enumerating exceptions); *id.* § 1684 (prohibiting discrimination against persons with blindness or a visual impairment). As originally enacted, the term 'program or activity' was undefined. But after the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 555 (1984), interpreted that term narrowly – to mean that receipt of federal funding did not "impose institution-wide obligations," *id.* at 574 – Congress enacted the Civil Rights Restoration Act of 1987, which defined 'program or activity' to encompass "all of the *operations of* . . . a college, university, or other postsecondary institution," Pub. L. No. 100-259, sec. 3(a), § 908, 102 Stat. 28, 28 (1988) (codified as amended at 20 U.S.C. § 1687) (emphasis added); *see NCAA v. Smith*, 525 U.S. 459, 466 n.4 (1999) ("Congress enacted the CRRA in response to [*Grove City College*], which concluded that Title IX, as originally enacted, covered only the specific program receiving federal funding."). Thus, Title IX covers the operations of colleges and universities that may be reasonably considered, at least in part, educational. *See Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 555 (3d Cir. 2017)

17

(construing the specific phase 'education program or activity' to mean any program or activity that "has 'features such that one could reasonably consider its mission to be, at least in part, educational'" (quoting *O'Connor v. Davis*, 126 F.3d 112, 117 (2d Cir. 1997))).

But that understanding alone does not sufficiently define the zone of interests protected by Title IX because, as legislation under Congress's spending power, Title IX is subject to a clear-statement rule. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181–82 (2005). Under that canon of construction, Congress must clearly state any conditions on the grant of federal funds so that funding recipients can knowingly decide whether to accept those funds. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *Pa. Dep't of Hum. Servs. v. United States*, 897 F.3d 497, 511 (3d Cir. 2018). And based on the Supreme Court's holding that Title IX creates a private cause of action, *see Cannon*, 441 U.S. at 709, one of the conditions attached to the receipt of Title IX funding is exposure to civil liability for violating Title IX's non-discrimination provisions. *See Jackson*, 544 U.S. at 182–83.

In its Title IX precedents, the Supreme Court has clarified the bounds of such liability in several respects, and from that guidance, two requirements emerge for being within the zone of interests protected by Title IX. First, for a Title IX plaintiff to be within that statute's zone of interests, the funding recipient must "exercise[] substantial control" over the individual who mistreats the plaintiff based on sex. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999). Second, the Title IX funding recipient must have substantial control over "the context" in which the mistreatment occurred or manifested. *Id.* at 630 ("[T]he harassment must take place in a context subject to the [defendant's] control."). Applied here, for Oldham's claims to be within the zone of interests protected by Title IX, Penn State

18

must have (i) had substantial control over the alleged offenders and (ii) had substantial control over the contexts in which the complained-of discrimination either occurred or manifested.

### 1. Penn State Had Substantial Control Over Abashidze, Glon, and Harris.

In evaluating whether Penn State had substantial control over each of the alleged offenders – Abashidze, Glon, and Harris – it is significant that they were each employed by Penn State. As a general principle, an employer exercises control over its employees. *See* Restatement (Second) of Agency § 220(1) (Am. L. Inst. 1958). And here, at the pleadings stage, the degree of control that Penn State had over each of those employees may be inferred as substantial.

With respect to the sexual harassment claims, the amended complaint alleges that Abashidze was representing the university on work travel. That allows the reasonable inference that Penn State exercised substantial control over him for purposes of Title IX. *See Lutz*, 49 F.4th at 334 ("[The plaintiff's] pleading receives the benefit of reasonable inferences at the motion-to-dismiss stage." (citing *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016))).

As to the retaliation claims, Oldham alleges that the campaign was widespread and targeted members of the fencing community over several months. From there, it may be reasonably inferred that the degree of control that Penn State had over two of the employees responsible for running its fencing program and communicating with other members of the fencing community – Abashidze and Glon – was substantial enough that Penn State as their employer had the power to order them to refrain from such a campaign. And with respect to Harris, the amended complaint alleges that, as Penn State's Title IX Coordinator, he was responsible for handling all reports of sexual misconduct made to Penn State, so it is reasonable to infer that Penn State had substantial control over his handling of those reports.

19

## 2. Penn State Had Substantial Control Over the Conduct that Occurred or Manifested on Its Campus.

The second requirement for the Title IX zone-of-interests test (substantial control over the context in which the discrimination occurred or manifested) is distinct from the first requirement (substantial control over the offender). *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 282 (3d Cir. 1998) (explaining that it is not enough that the offender was "aided in carrying out the sexual harassment . . . by his or her position of authority with the institution." (internal quotation marks and citation omitted)). And here, Oldham alleges that the discrimination occurred or manifested itself across multiple contexts.

The setting in which Oldham's sexual harassment claims occurred and manifested was the flight from Portland to Chicago. As a baseline, a recipient's grounds or campus generally qualify as a context over which it exercises substantial control. *See, e.g.*, *Davis*, 526 U.S. at 646 (reasoning that because "the bulk" of the misconduct of the harasser, who was a student, not an employee, "occur[red] during school hours and on school grounds," the context of the harassment was within the school's substantial control (citing *Doe v. Univ. of Ill.*, 138 F.3d 653, 661 (7th Cir. 1998), *cert. granted, judgment vacated sub nom. Bd. of Trs. of Univ. of Ill. v. Doe*, 526 U.S. 1142 (1999))). However, there may be instances in which a funding recipient exercises substantial control over an off-campus setting as well. *See, e.g.*, *Gebser*, 524 U.S. at 278, 292–93 (suggesting that a school could be held liable for a teacher who had a relationship with a minor student during class time but off of school property). And it is not difficult to imagine a scenario in which an off-campus flight might be subject to a university's substantial control. A chartered flight or one on which students are traveling with a university chaperone may well qualify. But the amended complaint lacks allegations about Penn State's substantial control over the flight, even though its allegations support Penn

20

State's substantial control over Abashidze. And without allegations connecting the flight itself to the operation of a program or activity of the university, Oldham has not provided a basis for inferring that Penn State had substantial control over that setting.

By comparison, the context for the alleged retaliation campaign against Oldham was much broader. It was allegedly orchestrated across the nation, including in Durham, in Richmond, at a SafeSport hearing, and at other fencing events. In addition, the effects of the retaliation campaign allegedly manifested in Oldham's actual or constructive exclusion from fencing tournaments and networking events;[9] the loss of employment opportunities as a fencing coach at Northwestern University and the University of North Carolina; and the departure of students from her own fencing school. Some of those contexts may be inferred to be within Penn State's substantial control for purposes of Title IX.

It is a reasonable inference that conversations that were part of the retaliation campaign occurred on Penn State's campus. The amended complaint alleges that the campaign was widespread, so it is reasonable to infer that at least some conversations occurred in Abashidze's or Glon's offices, at Penn State fencing events, or otherwise while Abashidze and Glon were on campus. Any conversations that occurred in those settings were within Penn State's substantial control and

[9] Although Oldham avers that her students faced retaliation at these events, without also alleging that those students were unable to sue on their own behalf, she lacks standing to assert claims for them. *See Campbell v. Louisiana*, 523 U.S. 392, 397 (1998) (setting forth the requirements for third-party standing); *Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288–89 (3d Cir. 2002) (same); *see also Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991) (explaining that a party claiming third-party standing bears the burden of establishing such standing).

21

thus within Title IX's zone of interests.  *See Davis*, 526 U.S. at 646 (explaining that a school has substantial control over its campus).  But for the other aspects of the retaliation campaign – those that occurred off campus or at locations in which Penn State was not hosting or supervising events – the amended complaint does not provide a basis for inferring that Penn State exercised substantial control over those settings.

Even so, the second requirement for the Title IX zone-of-interests test requires substantial control over the context in which the discrimination *either* occurred *or* manifested.  And even without Penn State's substantial control over off-campus settings in which the retaliation campaign may have occurred, the retaliation campaign is alleged to have manifested in settings over which Penn State had substantial control.  In particular, Oldham alleges that because of the retaliation campaign, she was excluded from events hosted by Penn State, including an invitational fencing tournament the weekend of November 3, 2018, and the NCAA fencing championships in March 2021.  From the allegation that Penn State hosted those events, it may be reasonably inferred that Penn State had substantial control over those settings such that Oldham's retaliation claim for exclusion from those events satisfies the second Title IX zone-of-interests requirement.  *See Davis*, 526 U.S. at 646 (explaining that a school has substantial control over what occurs during "school activities or otherwise under the supervision of school employees" (quoting *Univ. of Ill.*, 138 F.3d at 661)).

The other settings in which the retaliation campaign manifested itself were not within Penn State's substantial control.  The amended complaint does not allege that Penn State hosted or supervised the other fencing tournaments and events from which she was excluded, and nothing else in that complaint allows a reasonable inference that Penn State, merely by participating in those events, exercised substantial control over those contexts.  Oldham further seeks redress for her lost employment opportunities as a fencing coach at

22

Northwestern University and at the University of North Carolina. But it is not a reasonable inference from the allegations in the amended complaint that Penn State exercised substantial control over the hiring decisions of those two universities. Similarly, part of Oldham's Title IX claim involves the departure of her fencing students based on the effects of Glon and Abashidze's alleged retaliation campaign. The decisions of those students do not qualify as an educational program or activity over which Penn State had substantial control. Still, if any of the grounds for Oldham's exclusion from those events, her being passed over for the NCAA Division I coaching positions for which she had applied, or the loss of her students could be tied back to conversations occurring in a context over which Penn State had substantial control, then those components of her claim would also be within Title IX's zone of interests. And given the allegations in the amended complaint as to the campaign's breadth and duration, it is reasonable to infer at this stage of the proceedings that those components of Oldham's claim are within the zone of interests protected by Title IX.

## B. The District Court Erred in Dismissing Some of the State-Law Claims Against Abashidze, but It Correctly Dismissed the State-Law Claims Against Glon, Harris, and Penn State.

### 1. Determining the Forum State for a Hybrid Transfer of Venue

As claims within federal supplemental jurisdiction, *see* 28 U.S.C. § 1367(a), Oldham's tort claims are governed by the choice-of-law rules of the forum state, *see Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 n.8 (3d Cir. 1992) ("The teaching of *Klaxon Co. v. Stentor Elec[tric Manufacturing] Co.*, 313 U.S. 487 (1941), requires application of a forum state's choice-of-law principles in diversity cases, *id.*, and with respect to pendent state law claims, *see [Sys.] Operations, Inc. v. [Sci.] Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d Cir.

23

1977) . . . ."). The forum state for claims transferred under 28 U.S.C. § 1404(a) for the convenience of the parties is the state in which the original, transferor court is located. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964); *Ferens v. John Deere Co.*, 494 U.S. 516, 531 (1990). The forum state for claims transferred under 28 U.S.C. § 1406(a) as a cure for improper venue is the state in which the new, transferee court is located. *See Lafferty v. St. Riel*, 495 F.3d 72, 77 (3d Cir. 2007); 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3846 (4th ed. 2024 update).

Because the Middle District of North Carolina invoked both § 1404(a) and § 1406(a) to transfer the state-law claims, there are two relevant forum states. North Carolina is the forum state for the claims against Abashidze because those claims were transferred under § 1404(a) for the convenience of the parties.[10] Pennsylvania is the forum state for Oldham's claims against Glon, Harris, and Penn State because those claims were transferred under § 1406(a) as a cure for improper venue. Based on those respective forum states, the claims against Abashidze are governed by North Carolina's choice-of-law rules, and the claims against the other defendants are controlled by Pennsylvania's choice-of-law rules.

---

[10] The Fourth Circuit allows *sua sponte* transfers under § 1404(a). *See Feller v. Brock*, 802 F.2d 722, 729 n.7 (4th Cir. 1986). No party challenged that transfer through a mandamus petition in the Fourth Circuit. *See TechnoSteel, LLC v. Beers Constr. Co.*, 271 F.3d 151, 153–54 (4th Cir. 2001) (explaining that a party would need to use a mandamus petition to challenge a transfer); 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3855 (4th ed. 2024 update) (same). And once the case was transferred, no party moved to re-transfer the case to the Middle District of North Carolina. *See Hayman Cash Reg. Co. v. Sarokin*, 669 F.2d 162, 168–70 (3d Cir. 1982) (discussing the circumstances under which a motion to re-transfer may be granted).

### 2. *The Timeliness of the Tort Claims Against Abashidze*

Because North Carolina is the forum state for the claims against Abashidze, its choice-of-law rules control. It uses *lex fori* for statutes of limitations, *see Boudreau v. Baughman*, 368 S.E.2d 849, 853–54, 857 (N.C. 1988), and *lex loci delicti* for substantive tort law, *see SciGrip, Inc. v. Osae*, 838 S.E.2d 334, 343 (N.C. 2020). Under *lex fori*, the law of the forum in which the case was brought determines the controlling law, so North Carolina's relevant statutes of limitations – one year for defamation and three years for battery, negligence, and emotional distress – govern those claims against Abashidze. *See Boudreau*, 368 S.E.2d at 853–54, 857. Under *lex loci delicti*, the law of the state in which the injury occurred determines the applicable substantive tort law, which includes both the standard for claim accrual, *see Britt v. Arvanitis*, 590 F.2d 57, 59 (3d Cir. 1978), and the elements of the claim, *see SciGrip*, 838 S.E.2d at 343. Because Oldham pursues different claims, *lex loci delicti* must be analyzed on a claim-by-claim basis. *See id.* at 344.

### a. The Claim for Defamation Against Abashidze

Under North Carolina's one-year statute of limitations, Oldham's defamation claim must have accrued no earlier than one year before this lawsuit was filed – in other words, on or after May 27, 2019. *See Boudreau*, 368 S.E.2d at 853–54, 857; N.C. Gen. Stat. § 1-54(3). Using North Carolina's *lex loci delicti* rule to determine when a defamation claim accrues, no party argues that the defamation occurred in a state other than North Carolina or Pennsylvania. Under both North Carolina law and Pennsylvania law, a defamation claim accrues upon the publication of a non-privileged false statement of fact by a defendant. *See Price v. J.C. Penney Co.*, 216 S.E.2d 154, 156 (N.C. Ct. App. 1975); *Graham v. Today's Spirit*, 468 A.2d 454, 457 (Pa. 1983). Accordingly, for Oldham's defamation claim

25

against Abashidze to be timely under North Carolina law, such a statement must have been made on or after May 27, 2019.

But Oldham's amended complaint does not identify any defamatory statements made by Abashidze within that period. She alleges that between August 2018 and February 2019, Abashidze made non-privileged false statements of fact about her to members of the fencing community. Oldham also alleges that Abashidze's calling her a liar during his testimony at the SafeSport hearing in December 2018 qualifies as a non-privileged false statement. All of those statements, however, were made before May 27, 2019, and are thus time barred. *See generally Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975) ("[A] Rule 12(b) motion can be utilized when the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.").[11]

> b. The Claims for Battery, Negligence/Gross Negligence, and Negligent/Intentional Infliction of Emotional Distress Against Abashidze

Under *lex fori*, North Carolina's three-year statute of limitations governs Oldham's claims against Abashidze for battery, negligence, gross negligence, and negligent and intentional infliction of emotional distress. *See Boudreau*, 368 S.E.2d at 853–54, 857; *see also* N.C. Gen. Stat. § 1-52(5), (19). Ordinarily, to evaluate the timeliness of these claims, it would be necessary to determine their accrual dates using North Carolina's *lex loci delicti* rule. *See SciGrip*, 838 S.E.2d at 343. But the earliest those claims could have accrued is the date of the flight between Portland and Chicago, which was

---

[11] Because the defamation claims are otherwise time barred, it is not necessary to address whether statements made at the SafeSport hearing qualify as privileged.

26

December 12, 2017, and Oldham filed her original complaint on May 27, 2020.  So even using the earliest possible accrual date, Oldham filed her lawsuit within the three-year limitations period permitted by North Carolina law, and those claims are therefore not time barred.

### 3.  *The Challenges by Glon, Harris, and Penn State to the Tort Claims Against Them*

Like North Carolina, Pennsylvania uses separate choice-of-law rules for statutes of limitations and tort claims.

Under Pennsylvania law, the determination of the controlling statute of limitations depends on where the claim accrued.  For claims accruing out of state, Pennsylvania uses a first-barred rule under which the applicable statute of limitations is the shorter of Pennsylvania's and that of the state where the injury occurred.  *See* 42 Pa. Cons. Stat. § 5521(b); *Kornfeind v. New Werner Holding Co.*, 280 A.3d 918, 928 (Pa. 2022); *Ario v. Underwriting Members of Lloyd's of London Syndicates 33, 205, & 506*, 996 A.2d 588, 593 (Pa. Commw. Ct. 2010).  For claims accruing in state, Pennsylvania uses its applicable statute of limitations.  *See Kornfeind*, 280 A.3d at 928; *Ross v. Johns-Manville Corp.*, 766 F.2d 823, 826 & n.3 (3d Cir. 1985) (explaining that "Pennsylvania courts . . . apply the Pennsylvania statute of limitations" if the claim accrued in Pennsylvania (citing *Freeman v. Lawton*, 46 A.2d 205, 207 (Pa. 1946))).  Under those rules, regardless of the state in which the claims accrued, Oldham's claims would be time barred if she did not file suit within the applicable limitations period under Pennsylvania law.  That is so because if the claims accrued out of state, then the limitations period cannot exceed Pennsylvania's statute of limitations.  *See Aldossari ex rel. Aldossari v. Ripp*, 49 F.4th 236, 248 n.17 (3d Cir. 2022) (explaining that when Pennsylvania's choice-of-law rules apply, the longest possible statute of limitations is Pennsylvania's).  And if the claims accrued within Pennsylvania, then they are governed by

27

Pennsylvania's applicable statute of limitations. *See Ross*, 766 F.2d at 826. Thus, Oldham's defamation claims are time barred if they did not accrue within Pennsylvania's one-year statute of limitations for defamation. *See* 42 Pa. Cons. Stat. § 5523(1). Similarly, Oldham's remaining claims for battery, negligence, negligent training and supervision, and negligent and intentional infliction of emotional distress are untimely if they did not accrue in the two-year period allowed under Pennsylvania law for those claims. *See id.* § 5524(1), (7).

The determination of when a claim accrues is a substantive question of state tort law, and Pennsylvania uses a two-step true-conflict rule for substantive tort law. *See Melmark, Inc. v. Schutt ex rel. Schutt*, 206 A.3d 1096, 1104, 1106–07 (Pa. 2019). That rule first examines whether there is a "true conflict" between the laws of the two states. *Id.* at 1104 (quoting *Keystone Aerial Survs., Inc. v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 829 A.2d 297, 301 (Pa. 2003)). If there is no true conflict – meaning either that both states' laws lead to the same result or that one state has no policy interest in the outcome of the litigation – then Pennsylvania law applies. *See id.* But if a true conflict exists, then the rule dictates the application of the substantive law of the state with the most significant relationship to the events and the parties. *See id.* at 1106–07. Like North Carolina's rule, Pennsylvania's rule requires a claim-by-claim analysis. *See Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) (Alito, J.).

a.  The Claims for Defamation
Against Glon and Penn State

Because Oldham's defamation claims against Glon and Penn State are untimely if not filed within Pennsylvania's one-year limitation period for such claims, *see* 42 Pa. Cons. Stat. § 5523(1), only defamation claims that accrued within a year of this lawsuit's filing are timely. And using Pennsylvania's true-conflict choice-of-law rule to determine which state's law applies to determine a claim's accrual, there is no true conflict. The two states at issue here – North Carolina and

Pennsylvania – use the same rule: a defamation claim accrues upon the publication of a non-privileged false statement of fact by a defendant. *See Price*, 216 S.E.2d at 156; *Graham*, 468 A.2d at 457. Thus, claims premised on such statements made on or after May 27, 2019, one year before Oldham's lawsuit was filed, are timely.

But Oldham brings no such claims. She alleges that Glon slandered her during a telephone call with her former mentor in January 2018. Oldham also claims that Glon spread falsehoods about her within the fencing community between August 2018 and February 2019, including by calling her a liar during the December 2018 SafeSport hearing. She further asserts that Glon slandered her during a telephone call with the University of North Carolina fencing coach during or before January 2019. But all of those statements predate May 27, 2019, and they are therefore outside the limitations period.[12]

Oldham's defamation claim against Penn State does not identify any separate statements made by Penn State; rather, it is premised on Penn State's liability under *respondeat superior* for the statements by Glon and Abashidze. *See generally Commonwealth ex rel. Orris v. Roberts*, 141 A.2d 393, 398–99 (Pa. 1958) (explaining *respondeat superior* under Pennsylvania law). But since Oldham has not identified any potentially timely defamatory statement made by Glon or Abashidze, there is no basis for Penn State's vicarious liability. *See Ludwig v. McDonald*, 204 A.3d 935, 943 (Pa. Super. Ct. 2019) (explaining that underlying employee liability must exist for an employer to be held liable under *respondeat superior*). Accordingly, the District Court did not err in dismissing the defamation claim against Penn State.

---

[12] Again, because the SafeSport hearing took place before May 27, 2019, it is not necessary to determine whether any statements made at the hearing qualify as privileged.

b.  The Claim for Battery Against
    Penn State

Oldham also invoked *respondeat superior* to sue Penn State for battery based on Abashidze's conduct on the airplane. As explained above, such a claim is untimely if it was not filed within Pennsylvania's two-year statute of limitations. *See Aldossari*, 49 F.4th at 248 n.17; 42 Pa. Cons. Stat. § 5524(1). And, using Pennsylvania's true-conflict rule to determine the accrual date for a battery claim, there is no true conflict between Pennsylvania and the presently unknown state or states in which the battery occurred. *See Melmark*, 206 A.3d at 1104. That is so because the state over which the plane happened to be flying at the time of the alleged battery is not alleged to have had any further contact with the parties regarding the claim or to have any policy interest in the outcome of this litigation. *See id.* (explaining that there is no true conflict when the other state has no policy interest in the outcome of the litigation). Thus, applying Pennsylvania law, the claim accrued the day the alleged battery occurred. *See Fine v. Checcio*, 870 A.2d 850, 857–58 (Pa. 2005) (explaining that a battery claim accrues on the date it occurs when the victim of the battery is aware a touching has occurred). And because Oldham did not file this suit within two years of the date of the flight, this claim is time barred.

To excuse the untimeliness of this claim, Oldham argues for equitable tolling based on her initial filing of the claim in North Carolina, where venue was determined to be improper. Pennsylvania law determines whether equitable tolling applies to its statute of limitations. *See Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 45 (3d Cir. 1990) ("[S]tate tolling principles are generally to be used by a federal court when it is applying a state limitations period . . . ." (citing *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 463–64 (1975)); *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663–64 (3d Cir. 1980) (holding that under Pennsylvania's 'borrowing statute,' the federal court had to use Ohio equitable tolling cases to determine whether a diversity cause of action arising in Ohio

30

should be tolled under Ohio's statute of limitations).[13]  And Pennsylvania courts have acknowledged that equitable tolling may apply when "a plaintiff has asserted his rights in a timely fashion, but in the wrong forum." *Uber v. Slippery Rock Univ. of Pa.*, 887 A.2d 362, 366 (Pa. Commw. Ct. 2005) (citing *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994)); *see also Nicole B. v. Sch. Dist. of Phila.*, 237 A.3d 986, 996 (Pa. 2020) (citing *Uber* with approval).

However, under Pennsylvania law, to be filed 'in a timely fashion,' a lawsuit must have been filed within the statute of limitations of the proper forum, which in this case is Pennsylvania. *See Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 & n.3 (1990) (explaining that to be equitably tolled, a complaint must be filed within the proper statutory period but through a defective pleading – such as one filed in the wrong forum); *Nicole B.*, 237 A.3d at 994–96 (favorably citing *Irwin* and explaining that "equitable tolling pauses the running of, or 'tolls,' a statute of limitations," so a tolled claim is timely if the time between injury and the filing of the complaint in the wrong forum – when the running of the statute of limitations is paused – is less than the statute of limitations in the correct forum (quoting *Dubose v. Quinlan*, 173 A.3d 634, 644 (Pa. 2017))).  And when Oldham filed her battery claims in North Carolina on May 27, 2020, Pennsylvania's two-year statute of limitations, which started to run on December 12, 2017, had already expired.  Thus, her battery claim against Penn State is not susceptible to wrong-forum tolling and is otherwise time barred.

---

[13] An exception exists "when state tolling principles are not consistent with underlying federal policy."  *Vernau*, 896 F.2d at 45-46 (citing *Ry. Express*, 421 U.S. at 465).  Oldham does not contend that this exception applies.

c. The Claims for Negligence/Gross
Negligence, Failure to Supervise,
and Failure to Train Against Glon,
Harris, and Penn State

Oldham's claims against Glon, Harris, and Penn State for negligence, gross negligence, failure to supervise, and failure to train are premised on breaches of three sets of duties that those defendants allegedly owed her. *See Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1168 (Pa. 2000) ("The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." (citing *Gibbs v. Ernst*, 647 A.2d 882, 890 (1994))); *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 216–17 (3d Cir. 2022) (explaining that "the nature of the duty alleged to have been breached . . . [is] the critical determinative factor" in a negligence action (quoting *Bruno v. Erie Ins.*, 106 A.3d 48, 68 (Pa. 2014))).  The first duty they owed her, she asserts, was to keep her safe from sexual assault by an employee of the university.  The second was to properly handle her sexual assault complaint.  And the third set of duties relates to training and supervision: of Abashidze with respect to the alleged assault; of Glon with respect to his handling of the report of the alleged assault; and of both Abashidze and Glon with respect to the retaliation campaign they allegedly ran against Oldham.

Any claim based on a breach of these duties must have been filed within Pennsylvania's two-year statute of limitations, *see* 42 Pa. Cons. Stat. § 5524(7), which operates as the outer bar for timeliness, *see Aldossari*, 49 F.4th at 248 n.17.  For that reason, it is not necessary to determine whether Pennsylvania law imposes on the defendants the asserted first duty – that of keeping a non-student, non-employee safe from sexual harassment by a university employee.  The latest that any claim based on that duty and its breach could have accrued was the date of the alleged harassment, December 12, 2017.  *See Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000) (explaining that the statute of limitations begins running when a plaintiff suffers an injury unless she could not have

32

reasonably discovered that she was injured); *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 231 (3d Cir. 2003) (same). But Oldham's filing of this suit in May 2020 was not within two years of that date, so any such claim is time barred (and not susceptible to wrong-forum tolling).

The second duty that Oldham claims these defendants breached – that of properly addressing her Title IX complaint – is not generally recognized under Pennsylvania law, which governs because there is no true conflict of law between Pennsylvania and North Carolina. *See Melmark*, 206 A.3d at 1104. At most, Pennsylvania imposes on public universities a statutory duty to investigate claims made by students and employees. *See* 24 Pa. Cons. Stat. § 20-2003-J(a) (explaining that "[a] postsecondary institution shall establish and maintain an online reporting system to receive complaints of sexual harassment and sexual violence from students and employees" and that each "report shall be investigated through the process established in the postsecondary institution's sexual harassment and sexual violence policy"). But that duty does not extend to claims made by third parties, and Pennsylvania courts have not imposed a common-law duty upon schools or public universities to investigate complaints made by non-students and non-employees. *Cf. Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 40–41 & n.5 (Pa. Super. Ct. 2000) (explaining that there is no duty to prevent harm to third parties unless the injury is reasonably foreseeable; there is a special parent/child, master/servant, or landowner/lessor relationship; or one is responsible for someone with dangerous propensities). Thus, as neither a student nor an employee, Oldham fails to state a plausible negligence claim against Glon, Harris, and Penn State based on their alleged mishandling of her complaint.

As to the third set of duties – those related to training or supervision – the parties allege a conflict between Pennsylvania law and North Carolina law. Assuming *arguendo* that such a true conflict exists, the next step under

33

Pennsylvania's choice-of-law rule is to determine which state has the most significant relationship to the parties and events. *See Melmark*, 206 A.3d at 1106–1107. For the parties, Oldham is a resident of North Carolina, and the defendants are a state university in Pennsylvania and its employees. The events about which Oldham complains involve allegations that the university and its employees did not meet the duties that Oldham asserts society imposes on them. Thus, Pennsylvania has a more significant relationship to the parties and the events, and with that greater interest in "vindicat[ing] the policy interests underlying" Oldham's claims, *id.* at 1107, its substantive law applies to the failure-to-supervise and failure-to-train claims.[14]

For direct liability under the common law for failure to supervise, Pennsylvania uses the standard set forth in the Second Restatement of Torts. *See Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 419–20 (Pa. 1968); *Hutchison ex rel. Hutchison v. Luddy*, 742 A.2d 1052, 1055 (Pa. 1999); *Walters v. UMPC Presbyterian Shadyside*, 187 A.3d 214, 233 (Pa. 2018). That standard limits such a claim in several respects,

---

[14] For perspective, in the context of federal civil rights litigation under 42 U.S.C. § 1983, where principles of *respondeat superior* do not apply, courts have developed failure-to-supervise and failure-to-train theories of liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *e.g.*, *Forrest v. Parry*, 930 F.3d 93, 107 (3d Cir. 2019); *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). That precedent, however, has little if any bearing on failure-to-supervise and failure-to-train claims under Pennsylvania common law, which recognizes theories of direct liability and vicarious liability, including *respondeat superior*, for tort claims. *See Green v. Pa. Hosp.*, 123 A.3d 310, 316 (Pa. 2015); *see also Travelers Cas. & Sur. Co. v. Castegnaro*, 772 A.2d 456, 460 (Pa. 2001); *Salsberg v. Mann*, 310 A.3d 104, 123 (Pa. 2024) (citing *Tayar v. Camelback Ski Corp., Inc.*, 47 A.3d 1190, 1196 (Pa. 2012)).

including that liability attaches only when the employee acts outside of the scope of his employment while on his employer's premises or while using his employer's chattels:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> > (a) the servant
> >
> > > (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
> > >
> > > (ii) is using a chattel of the master, and
> >
> > (b) the master
> >
> > > (i) knows or has reason to know that he has the ability to control his servant, and
> > >
> > > (ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 317 (Am. L. Inst. 1965); *cf. Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 489 (3d Cir. 2003) (applying Pennsylvania law and explaining that "[n]egligent supervision differs from employer negligence under a theory of *respondeat superior*").

Oldham's amended complaint does not plausibly allege that Harris or Glon had any such duty. As used in the Second Restatement, the term 'master' refers to an owner of the premises, and later cases have extended it to employers and those with an ownership interest – but not to supervisors. *See* Restatement (Second) of Torts § 317 cmt. b; *Brezenski*, 755 A.2d at 41–42 (interpreting 'master' to refer to the company employer). This definition forecloses the claims against Harris and Glon on these allegations. The amended complaint alleges that Harris was Glon's supervisor, but it does not allege that Harris employed Glon or owned the premises. For similar reasons, the claim against Glon fails: the amended complaint does not allege that Glon employed Abashidze or owned the premises.[15]

The failure-to-supervise tort claim directly against Penn State also cannot succeed. Failure-to-supervise liability extends only to a servant's actions taken outside the scope of employment. *See* Restatement (Second) of Torts § 317. And the amended complaint alleges that "[a]t all relevant times, Glon and Harris were acting within the course and scope of their employment by Penn State University," Am. Compl. ¶ 150. Thus, Oldham's allegations do not permit a finding of Penn State's tort liability for a failure to supervise Glon or Harris.

Unlike its allegations with respect to Glon and Harris, the amended complaint is silent on whether Abashidze was acting within the scope of his employment when he allegedly engaged in the retaliatory harassment campaign. Silence, however, is not a solution because being outside of the scope of employment is a necessary element of a common-law claim for failure to supervise. *See* Restatement (Second) of Torts § 317.

---

[15] Because the failure-to-supervise tort claims against Glon and Harris fail, Penn State cannot be vicariously liable under *respondeat superior* based on their actions. *See Brezenski*, 755 A.2d at 42.

And without such an allegation, the only way that a tort claim against Penn State for failure to supervise Abashidze in this respect can survive the pleading stage is if it may be reasonably inferred from the allegations in the amended complaint that Abashidze's undertaking a retaliation campaign against Oldham was outside the scope of his employment. *See Lutz*, 49 F.4th at 334 ("[The plaintiff's] pleading receives the benefit of reasonable inferences at the motion-to-dismiss stage." (citing *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016))).

Such an inference is not reasonable here. In defining 'scope of employment,' Pennsylvania historically endorsed the formulation by Justice Charles Andrews of the New York Court of Appeals, which included a high degree of employee misconduct within the scope of employment:

> It is, in general, sufficient to make the master responsible that he gave to the servant an authority or made it his duty to act in respect to the business in which he was engaged when the wrong was committed, and that the act complained of was done in the course of his employment. The master in that case will be deemed to have consented to and authorized the act of the servant, and he will not be excused from liability, although the servant abused his authority, or was reckless in the performance of his duty, or inflicted an unnecessary injury in executing his master's orders. The master who puts the servant in a place of trust or responsibility, and commits to him the management of his business or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the

37

strict line of his duty or authority, and inflicts an unjustifiable injury upon another.

*Brennan v. Merch. & Co.*, 54 A. 891, 892 (Pa. 1903) (quoting *Rounds v. Del., Lackawanna & W. R.R. Co.*, 64 N.Y. 129, 134 (1876) (Andrews, J.)); *accord Orr v. William J. Burns Int'l Detective Agency*, 12 A.2d 25, 27 (Pa. 1940) (quoting *Rounds*, 64 N.Y. at 134). Under that standard, even supposing that Abashidze's waging the retaliation campaign went "beyond the strict line of his duty or authority," that would not take him outside of the scope of his employment because his alleged actions in that respect were the result of a "lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion." *Brennan*, 54 A. at 892 (quoting *Rounds*, 64 N.Y. at 134).

For completeness, Pennsylvania courts – without a formal abandonment of that common-law standard – have more recently gravitated to the scope-of-employment test announced in the Restatement (Second) of Agency. *See, e.g.*, *McGuire ex rel. Neidig v. City of Pittsburgh*, 285 A.3d 887, 892 (Pa. 2022); *Justice v. Lombardo*, 208 A.3d 1057, 1070 (Pa. 2019); *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1272 (Pa. Super. Ct. 1979). Under that test, which consists of three elements when the use of intentional force is not implicated, an employee acts within the scope of his employment "if, but only if," (i) he engages in conduct "of the kind he is employed to perform"; (ii) the conduct "occurs substantially within the authorized time and space limits"; and (iii) the conduct "is actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228(1)(a)–(c) (Am. L. Inst. 1958); *cf. id.* § 228(1)(d) (including a fourth requirement when the use of force is involved: that "the use of force is not unexpectable by the master").

By the allegations in her pleadings and the reasonable inferences therefrom, Oldham does not provide a basis for disproving any of the Restatement's three relevant elements.

38

For the first element – whether the conduct is of the kind that Abashidze was employed to perform – Oldham alleges that Abashidze was an assistant coach and a representative of the university, and it is unreasonable to infer that in such a position, his employment did not include speaking with other coaches and members of the fencing community. The second element is met as well because Oldham does not allege that Abashidze conducted the retaliation campaign substantially outside the authorized time and space limits of his employment. Nor is that a reasonable inference. Indeed, in her opening appellate brief Oldham argues, for different reasons, that it would be reasonable to infer that Abashidze was on his "office phone[] and/or mingling at campus fencing events" when he spoke against her. Opening Br. 53. And for the third element – that the conduct was actuated, at least in part, by a purpose to serve the master – it is not alleged and cannot be reasonably inferred that Abashidze's efforts to discredit Oldham helped only himself. Rather, a university – especially one with a history like Penn State's – would benefit from having claims that a coach committed sexual assault dismissed and disregarded. *Cf. Wilson v. Libby*, 535 F.3d 697, 711–12 (D.C. Cir. 2008) (explaining that under District of Columbia law, disclosing the identity of a covert agent was within the scope of employment because it "ar[ose] out of a dispute that was originally undertaken on the employer's behalf" (quoting *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006)), *abrogated on other grounds by Trump v. Carroll*, 292 A.3d 220 (D.C. 2023))).[16] With each of the

---

[16] Other allegations in the amended complaint also make such an inference unreasonable. Specifically, that complaint alleges Abashidze was acting within the scope of his employment when he harassed Oldham and that Glon was acting within the scope of his employment when he participated in the retaliation campaign. If Abashidze was acting *within* the scope of his employment when he allegedly harassed Oldham, and if Glon was acting *within* the scope of his employment when he allegedly engaged in a retaliation campaign against Oldham,

elements indicating that Abashidze acted within the scope of his employment in allegedly conducting a retaliation campaign, Oldham has not plausibly alleged a tort claim directly against Penn State for failure to supervise him in that respect.

As for the failure-to-train claim, Pennsylvania recognizes such a tort only in the context of a negligence action. *See id.* (explaining that liability may exist "only if all the requirements of an action of tort for negligence exist" (quoting Restatement (Second) of Agency § 213 cmt. a (Am. L. Inst. 1958))). The foundation of a negligence claim is the existence of a freestanding duty of care. *See Althaus*, 756 A.2d at 1168; *see also SodexoMAGIC*, 24 F.4th at 216–17. And as explained above, Pennsylvania has not recognized a duty to train employees to investigate third-party claims of harassment, nor has it recognized a duty to train employees to not engage in the defamation of third parties. *See* 24 Pa. Cons. Stat. § 20-2003-J(a). Thus, since Oldham has not adequately pleaded a negligence claim, she has not adequately pleaded a failure-to-train claim. And without a claim for direct liability for failure to train, Penn State cannot be vicariously liable. *See Ludwig*, 204 A.3d at 943.

> d. The Claims for Negligent and Intentional Infliction of Emotional Distress Against Glon, Harris, and Penn State

For the reasons above, using Pennsylvania's limitations period as the outer bounds of timeliness, Oldham's claims for the infliction of emotional distress are time barred if they were not filed within two years of their accrual. *See* 42 Pa. Cons.

---

then it is unreasonable to infer that Abashidze was acting *outside* the scope of his employment when he allegedly participated with Glon in the retaliation campaign against Oldham.

Stat. § 5524(7); *Aldossari*, 49 F.4th at 248 n.17.  And because the alleged in-flight battery occurred outside of that period, the only potentially timely claims for emotional distress are those premised on the alleged improper investigation of Oldham's report and the retaliation campaign against Oldham as a victim of harassment.  As with the other claims, because Pennsylvania is the forum state, its true-conflict choice-of-law rule determines the controlling substantive tort law.

Under the first step of the true-conflict rule, there is a difference between Pennsylvania and North Carolina substantive law.  In Pennsylvania, claims for both the negligent infliction and the intentional infliction of emotional distress require a physical injury.  *See Toney v. Chester Cnty. Hosp.*, 961 A.2d 192, 200 (Pa. Super. Ct. 2008) (requiring a physical injury for negligent infliction of emotional distress), *aff'd*, 36 A.3d 83 (Pa. 2011); *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005) (requiring a physical injury for intentional infliction of emotional distress (citing *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122 (Pa. Super. Ct. 2004))); *see also Redland Soccer Club, Inc. v. Dep't of the Army*, 55 F.3d 827, 848 (3d Cir. 1995) (construing Pennsylvania law to require a physical injury for negligent infliction of emotional distress); *Davis v. Wigen*, 82 F.4th 204, 216 (3d Cir. 2023) (construing Pennsylvania law to require a physical injury for intentional infliction of emotional distress).  *See generally Ndungu v. Att'y Gen.*, 126 F.4th 150, 171 (3d Cir. 2025) (recognizing that "a ruling by the Superior Court of Pennsylvania is ordinarily an authoritative source of Pennsylvania state law").  But in North Carolina, claims for the negligent or the intentional infliction of emotional distress do not require a physical injury.  *See Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 395 S.E.2d 85, 97 (N.C. 1990) (citing *Dickens v. Puryear*, 276 S.E.2d 325, 332 (1981)); *Turner v. Thomas*, 794 S.E.2d 439, 446 (N.C. 2016) (citing *Dickens*, 276 S.E.2d at 335).  Thus, there is a true conflict between Pennsylvania and North Carolina law.

41

But under the second step of the true-conflict rule, Pennsylvania has the most significant relationship to the parties and the events for the same reasons as for the negligent training and supervision claims. *See Melmark*, 206 A.3d at 1106–07. The claims relate to a state university in Pennsylvania and its employees, and North Carolina has little interest in how Penn State and its employees conduct investigations into complaints against Penn State employees. Pennsylvania similarly has a more significant relationship to the claims of a retaliation campaign against Oldham. Although Glon and Abashidze allegedly spoke against Oldham, a citizen of North Carolina, around the country, Pennsylvania has a particular interest in a state university's coaches' carrying out a retaliatory harassment campaign. Thus, Pennsylvania substantive tort law applies.

Using Pennsylvania's formulation, Oldham fails to state a claim for the infliction of emotional distress, either negligently or intentionally, because she does not allege any companion physical injury within the two-year limitations period. *See Toney*, 961 A.2d at 200; *Swisher*, 868 A.2d at 1230; *see also Redland Soccer Club*, 55 F.3d at 848; *Davis*, 82 F.4th at 216. It was therefore not an error for the District Court to dismiss those claims against Glon, Harris, and Penn State.

## IV.   CONCLUSION

For these reasons, the District Court's decision will be affirmed in part, vacated in part, and remanded for further proceedings in accordance with this opinion.